# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-2975

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ADOM L. DANIELS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:03-CR-22 RM—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

ARGUED APRIL 21, 2004—DECIDED JUNE 2, 2004

———————

Before COFFEY, MANION, and KANNE, *Circuit Judges.*

PER CURIAM. In April 2003 a jury found defendant Adom
Daniels guilty of possessing cocaine base with intent to
distribute, 21 U.S.C. § 841(a)(1); possessing a firearm in
furtherance of a drug trafficking offense, 18 U.S.C.
§ 924(c)(1)(A)(I); maintaining a crack house, 21 U.S.C.
§ 856(a)(1); and assaulting a witness to prevent communica-
tion with law enforcement, 18 U.S.C. § 1512(a)(2)(C). After
the verdict, Daniels moved for a judgment of acquittal on
the § 924(c) charge, Fed. R. Crim. P. 29(c), which the
government had pursued on an aiding-and-abetting theory,
*see* 18 U.S.C. § 2. The district court denied the motion, rea-
soning that the jury had "ample evidence" to find Daniels

guilty. On appeal, Daniels again contends that the § 924(c) conviction cannot be sustained on an aiding-and-abetting theory.

Daniels and his brother Darrell Turner sold crack cocaine from a rented upstairs apartment in Michigan City, Indiana. Before obtaining a search warrant for the apartment, the police set up two controlled buys. The first was carried out on January 30, 2003, by confidential informant Laron Ross, who had previously arranged with Turner to purchase two "eight balls" of crack cocaine. After police strip searched him and equipped him with a wire, Ross was dropped off at the apartment. Ross testified that when Turner appeared at the door, he had a handgun in his waistband. The two walked to the upstairs apartment where Ross saw Daniels. Turner told Daniels that Ross was the one who wanted the drugs, and Daniels retrieved the drugs from the pantry and handed them to Ross. Ross then handed Daniels the money, and Ross left and was processed by the police.

Later that same day the police set up a second controlled buy with Mickey Shipp, a drug user and former drug dealer. Shipp lived across the street from the brothers' second-floor apartment, visited there three or four days a week, and regularly received visits from Turner at his own home. The officers wired Shipp, gave him some pre-recorded buy money, and dropped him off near the apartment. Turner answered the door with a shotgun in his hands. They went upstairs, and Turner sold him the crack for $50. Turner was the only person at the apartment, but Shipp testified that Turner stated that his brother was "coming back with enough for all of us."

Shipp testified regarding several security measures that were in place at the apartment to ensure that the drugs and two brothers were protected. First, the door to the apartment was secured with a two-by-four. Shipp said that this would give the brothers more time to dispose of the drugs if someone came to the residence. Second, a vat of bleach was kept at all times, so that if the police came the

drugs could be dropped into the bleach and dissolved. Finally, Shipp testified that he saw two weapons at the apartment: "a black shotgun and a revolver." He said that he had seen Turner handle the shotgun, and that the brothers had the guns "[i]n case if anybody tried to rob them or if the police tried to come inside."

The day after the second controlled buy, the police executed a search warrant and recovered a loaded .12 gauge shotgun, a loaded .38 caliber handgun, and $493.85—including the $50 from Shipp. Daniels was not present at the time, but he was arrested several days later inside the apartment. When arrested, Daniels was carrying $50 of the pre-recorded buy money from the drugs purchased by Ross.

The § 924(c) conviction is premised on Turner's possession of a handgun when he took informant Ross upstairs to get the crack from Daniels during the first controlled buy. The § 924(c) conviction yielded a five-year sentence that is consecutive to Daniels' sentences for the other three convictions, and Daniels argues here that the jury's verdict—finding him guilty under the aiding-and-abetting theory for Turner's possession of the handgun during a trafficking offense—was not supported by sufficient evidence. More specifically, he argues that he did not commit an affirmative act that facilitated the possession of the firearm by Turner, and thus cannot be criminally liable under an aiding-and-abetting theory.

A defendant may be held liable for aiding and abetting—a violation of § 924(c) if the government proves that "the defendant knowingly and intentionally assisted the principal's" use or possession of a firearm during a violent felony or drug trafficking offense. *United States v. Taylor*, 226 F.3d 593, 596 (7th Cir. 2000); *see United States v. Woods*, 148 F.3d 843, 848 (7th Cir. 1998). The defendant must know, either before or during the crime, that the principal will possess or use a firearm, and then after acquiring knowl-

edge intentionally facilitate the weapon's possession or use. *Taylor*, 226 F.3d at 596; *Woods*, 148 F.3d at 848. "Merely aiding the underlying crime and knowing that a gun would be used or carried cannot support a conviction under 18 U.S.C. § 924(c)," *Woods*, 148 F.3d at 848 (emphasis deleted), because the defendant must aid and abet the possession, or carrying, or use of the weapon. *See Taylor*, 226 F.3d at 597.

Of these two elements—knowledge and facilitation— Daniels challenges only the element of facilitation. He concedes that he knew that Turner had a gun: "In this case it cannot be realistically disputed that the jury could reasonably infer that the Appellant was aware, at least on the morning of January 30, 2003, that his brother [Darrell] Turner was in possession of a firearm and that possession was directly related to the drug trafficking which was to take place at [the apartment] some time that morning." But he contends that the jury could not reasonably find that he facilitated Turner's possession of the gun, arguing that "there was no evidence of an affirmative act demonstrating that the Appellant intentionally facilitated the weapon's possession."

We have stated that " '[o]nce knowledge on the part of the aider and abettor is established, it does not take much to satisfy the facilitation element.' " *Woods*, 148 F.3d at 848 (quoting *United States v. Bennett*, 75 F.3d 40, 45 (1st Cir. 1996)). *Woods* provides several examples of conduct that will satisfy the facilitation element, including transporting the principal and firearm to the scene of the crime, encouraging others to use a gun in the commission of the underlying crime, and benefitting from the use of a gun.

In *Woods* we endorsed the position that under § 924(c), a jury may reasonably infer that the defendant facilitated his accomplice's gun violation if the defendant benefitted from the gun. *Woods*, 148 F.3d at 848 (citing *United States v. Medina*, 32 F.3d 40, 46-47 (2d Cir. 1994) (holding that a division of labor may amount to facilitation where an un-

armed person's presence during a robbery makes it easier for the co-conspirator to carry a firearm) and *United States v. Morrow*, 977 F.2d 222, 231 (6th Cir. 1992) (en banc) (holding that an inference of facilitation was appropriate where both the aider and the principal benefitted from the presence of the firearm)).

Daniels and Turner had different tasks when Ross purchased the crack during the first controlled buy. Turner answered the door with a visible weapon in his waistband, led Ross upstairs, and instructed Daniels that Ross was the one who wanted two eight balls. Daniels gathered the drugs, handed the crack to Ross, and collected the money, all of which occurred while Turner's gun was visibly displayed in his waistband. Under *Medina*, this was sufficient evidence for a jury to reasonably infer that Daniels facilitated Turner's possession of the weapon during the drug deal because by handling the drugs and money he allowed Turner to devote his attention solely to the task of providing armed security. *See Medina*, 32 F.3d at 47 (division of labor theory).

In addition, Daniels benefitted from the protection of the firearm. Turner and Daniels relied upon several levels of security in their drug trafficking operation, including answering the door with a weapon. Shipp testified that anyone who answered the door brought a weapon, and this was true as well when Daniels answered the door. This system benefitted Daniels, specifically during Ross's controlled buy, because Turner made the first contact and assured that Ross could see the gun before he ever reached Daniels or the drugs.

AFFIRMED.

**A true Copy:**

   **Teste:**

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—6-2-04