United States Court of Appeals
Fifth Circuit

**F I L E D**

June 27, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 05-20123

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODNEY LEE THOMPSON; ANDRE MARSELLES CARTER,

Defendants-Appellants.

Appeal from the United States District Court
For the Southern District of Texas

Before SMITH, GARZA, and OWEN, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Rodney Thompson and Andre Carter (collectively, "Defendants") appeal their convictions and sentences for bank robbery, attempted bank robbery, and two counts of brandishing a firearm during the commission of a crime of violence, in violation of 18 U.S.C. §§ 2113(a) and (d); 18 U.S.C. § 924(c)(1)(A)(ii); and 18 U.S.C. § 2. They argue that the district court committed a variety of errors both during the trial and at sentencing.

## I

In a four-count indictment, Thompson and Carter were charged with robbing a bank in Brookshire, TX, on July 11, 2003 (Count I, the "July robbery"); attempting to rob the same bank again on September 12 of that year (Count III, the "September robbery"); and brandishing a firearm during each of the two robberies (Counts II and IV).[1] The evidence at trial established that, on the morning of the July robbery, William Kitzman, a bank official, arrived at work at 7:10, parked behind the building, and was walking toward the back door of the bank when he was approached by a masked man armed with a gun. The robber instructed Kitzman to open the vault, but Kitzman explained that only Lois Rainer, another employee, had the combination. Rainer arrived at 7:20. Following the robber's directions, she opened the vault, and the robber took approximately $150,000. Around the time the robber was finishing up, Rainer heard the bell that signals that a car has pulled into the drive-through lane.

The robber wore black clothes, an orange visor, and a grey mask. Rainer was able to tell that he was a black man because she could see the skin around his eyes and some more between the top of his mask and bottom of his visor.

The same morning, at about 7:15, Officer Jennifer Zermeno-Leal and another officer noticed a light-colored four-door car parked near the Brookshire police station. A black man with a gold tooth, wearing an orange visor, was talking on his cell phone outside the car. When the officers approached the man to see if he needed help, he explained that he had run out of gas but that his wife was on her way to pick him up.

---

[1] Each count also alleged that each defendant aided and abetted the other in the commission of the offense. *See* 18 U.S.C. § 2.

Zermeno was called to the robbery scene at about 7:40am. By that time, the car parked near the police station was gone. Rainer and Kitzman recounted the morning's events. When Zermeno heard about the car in the drive-through lane, she suspected that the light-colored car parked near the police station might have been the robber's getaway car. Officers recovered an orange visor and a sweatshirt not far from the bank on the street on which the light-colored car had been parked.

On September 11, 2003, Nimet Lakhani, who owns a dry-cleaning business in Brookshire not far from either the bank or the police station, arrived at work while it was still dark outside. She noticed a car in the parking lot that kept turning on and off its lights. She called the police. Officer Michael Rosenberg responded and questioned the two men in the car about what they were doing. They told him that they were waiting for the Dollar General Store to open so they could buy some cleaning supplies. They stated that the supplies were for their father's church. When asked, they could not tell Officer Rosenberg where the church was. Rosenberg asked for their identification and learned that they were the Defendants, Carter and Thompson, who both live in Houston. After Rosenberg suggested that the men "get a cup of coffee," Carter and Thompson left.

The next morning, Kitzman arrived at work at about 7:10. As he was walking toward the bank, he saw a masked man running toward him. This man had come from inside a dark blue Ford Explorer. The man had a gun, pointed it at Kitzman's head, and told him, "Okay, we're going to do this again." They went inside the bank. The robber then got on his cell phone, and Kitzman overheard a man on the other end yelling that the robber needed to get out of there because someone was looking at the other man's license plate. The robber ran out the back door without taking any money.

An eyewitness who had seen the encounter outside the bank called the police. He and two

-3-

people with him then went back outside, where they saw the robber run out of the bank toward some nearby woods. They also saw the Ford Explorer leave the parking lot.

When Officer Zermeno heard about the second robbery and about the two men outside the dry cleaners the day before, she asked to see Carter's and Thompson's driver's license photos. She recognized Carter, who has a gold tooth, as the man who had been parked near the police station on the morning of the first robbery.

Tracking dogs were used to search the wooded area into which the robber had fled. Police recovered a large black canvas bag and a loaded revolver.

One of the eyewitnesses picked Thompson out of a photo line-up as the man he saw running from the bank.

A police investigation of the Defendants revealed that at the time of the first robbery, Thompson's girlfriend had loaned him her white Ford Taurus while she was out of town. The Taurus was consistent with the light-colored car next to which Officer Zermeno saw Carter standing on the day of the robbery. Both Defendants began spending large amounts of money soon after the July robbery. Thompson, who was unemployed at the time, purchased a used car, furniture, and expensive clothes. Carter purchased two used cars, for which he paid in cash. Police also learned that sometime in August or September of 2003, Carter's brother, Dedrick Hunter, purchased the revolver that was recovered from the woods after the second robbery and that Hunter had sold a gun to Carter later that summer.

In August 2003, Thompson had told a friend of his girlfriend's that he had robbed a bank in a small town and taken about $170,000. He told this woman, Anita Wertz, that he intended to rob the bank again. On the day of the second robbery, he called Wertz and told her that he had done what

he said he was going to do. He said that he had had to run into some woods and that he would have gotten caught had he not had his Nextel walkie-talkie with him.

Carter was arrested and interviewed by an FBI agent. He denied any involvement. Police subpoenaed phone records for the telephone number Carter provided. Nextel, the service provider, indicated that Thompson's name was on the account for that number. The records indicated many calls between that number and the other number on the account, which Thompson's girlfriend said was Thompson's number, on the mornings of September 11 and 12. There were also several direct-connection calls between the two phones. Like a walkie-talkie, the direct-connect function allows for one-way instantaneous communication. The phone records also indicated that all of these calls were routed through cell towers that serve the area in and around Brookshire.

Finally, testing matched Thompson's DNA to DNA found on the orange visor and the sweatshirt recovered after the first robbery.[2]

Both Defendants were convicted on all four counts. Carter was sentenced to 462 months: 78 months for each robbery, running concurrently; 84 months for the first gun charge, and 300 months for the second gun charge. Because of his criminal history, Thompson received a greater sentence, 646 months: 262 for the robberies, 84 for the first gun charge, and 300 for the second.

II

A

In their initial argument challenging their convictions, Defendants claim that the district court

---

[2]  The testing indicated that there was only a 1 in 16.7 trillion chance that another black person contributed the DNA on the visor and sweatshirt.

should not have admitted Carter's wife's testimony from a pre-trial detention hearing.[3]  At that hearing, defense counsel called Carter's wife to the stand to bolster the defense's bail request.  On cross-examination, Mrs. Carter testified that in the summer of 2003, Carter's brother, Dedrick Hunter, delivered to her a gun that Carter had purchased from him.  Defendants argue that no one advised Mrs. Carter that her testimony could be used against her husband at trial and that if she been so warned, she might have invoked the witness-spouse privilege.  Defendants did not object to the admission of the testimony at trial.

Ordinarily, we review evidentiary rulings for abuse of discretion, but when the complaining party failed to object at trial, we review only for plain error.  *United States v. Avants*, 367 F.3d 433, 443 (5th Cir. 2004).  To demonstrate plain error, Defendants must show that the district court committed an error that was clear or obvious and that affected Defendants' substantial rights.  *See United States v. Alvarado-Santilano*, 434 F.3d 794, 795 (5th Cir. 2005) (citation omitted).  Even if Defendants can demonstrate a plain error, we will not correct it unless Defendants can also show that "the error has a serious effect on the fairness, integrity, or public reputation of judicial proceedings." *Id.*

The witness-spouse privilege permits a witness to refuse to testify against his or her spouse. *United States v. Kohler*, 790 F.2d 1256, 1258 (5th Cir. 1986).  Defendants point to no case law that suggests that a witness must be affirmatively warned of the right not to testify against his or her spouse.  Their argument therefore requires the extension of existing precedent.  Arguments that require such extension of existing precedent cannot meet the "plain error" standard.  *United States*

---

[3]  Defendants' preliminary contention that the indictment was defective because it was not dated or signed by the grand jury foreperson is meritless, as the record contains a dated, signed copy of the indictment.

*v. Hull*, 160 F.3d 265, 271-72 (5th Cir. 1998). Accordingly, Defendants have not demonstrated that the admission of Mrs. Carter's testimony was plain error.

B

Defendants argue that the district court should have granted their motions for a judgment of acquittal because the evidence was insufficient to support their convictions. We review *de novo* the district court's denial of a motion for judgment of acquittal. *United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005). We will affirm conviction if, "view[ing] the evidence and inferences therefrom in the light most favorable to the jury's verdict . . . a rational jury could have found the defendant[s] guilty beyond a reasonable doubt." *United States v. Dotson*, 407 F.3d 387, 390 (5th Cir. 2005).

1

As to Counts I and III, Defendants argue that there is insufficient evidence tying either of them to the July and September robberies. We have no trouble concluding that the evidence was sufficient as to both Defendants on both counts. The morning before the September robbery, Officer Rosenberg saw the Defendants together in Brookshire, and when asked, they offered a suspicious reason for being there. Heavy phone traffic between the Defendants during the time of the robbery puts them both in Brookshire on that day. An eye-witness identified Thompson as the man he saw coming into and out of the bank at the time of the robbery. The witness also saw Thompson run from a Ford Explorer, which drove away when Thompson fled the bank, indicating that Thompson did not act alone. The gun found near the bank after the September robbery had been purchased by Carter's brother earlier in the summer, and Carter had purchased a gun from his brother around that time. This evidence is sufficient to support the conviction of both Defendants for the September

robbery.

As to the July robbery, the similarities between the two robberies and the fact that during the September robbery, the robber said, "Okay, we're going to do this again," strongly suggest that they were committed by the same person or persons. Moreover, the orange visor recovered after the July robbery had DNA on it that matched Thompson's DNA. Officer Zermeno placed Carter in Brookshire on the day of the July robbery, standing in a place where he could watch police officers arriving at and leaving the police station and talking on his cell phone. He was gone by the time police were summoned to the bank, however. Rainer's testimony that she heard a car enter the drive-through lane shortly before the robber left the bank further supports the government's theory that there was a getaway driver at the first robbery. Finally, both defendants began spending large sums of money after the July robbery. Based on this evidence, a rational jury could have found beyond a reasonable doubt that the Defendants committed both robberies together.

2

Because there is sufficient evidence linking Thompson to both robberies and because Kitzman testified that during each of the robberies the robber held Kitzman at gunpoint, the evidence was also sufficient to convict Thompson of Counts II and IV. Whether the evidence was sufficient to convict Carter on the gun counts requires more analysis, however.

In *Lopez-Urbina*, the defendant challenged the sufficiency of the evidence to support his conviction for "aiding and abetting the use and carrying of a firearm during a crime of violence in contravention of 18 U.S.C. §§ 2 and 924(c)." *Lopez-Urbina*, 434 F.3d 750. The court began by analyzing what the government must prove to support a conviction under these statutes:

[T]he prosecution must prove that the defendant acted with the knowledge or specific

intent of advancing the 'use' of a firearm . . . there must also be proof that the defendant performed some affirmative act relating to the firearm . . . In other words, a defendant's knowledge of the underlying offense or knowledge that a gun will be used in the commission of the underlying offense is not sufficient to sustain a conviction; there must be evidence that the defendant took some action to facilitate or encourage the use or carrying of a firearm.

*Id.* at 758 (internal citations and quotations omitted).

In *Lopez-Urbina*, a witness testified that one defendant provided another with a gun for the express purpose of using it during carjackings. *Id.* We reasoned that this evidence established both the requisite knowledge or specific intent and an affirmative act that facilitated the use of a gun in the underlying crimes. *Id..* at 758-59.

*Lopez-Urbina* is on point with respect to Carter's conviction for aiding and abetting the use of a firearm during the September robbery. There was evidence from which the jury could infer that Carter purchased a gun from his brother and then provided it for Thompson to use in the robbery. Because Carter did not receive the gun until after the July robbery, however, there is no evidence that Carter supplied the gun used in the first robbery. We must therefore consider whether there was other evidence that establishes that Carter knew or intended that a gun would be used in the July robbery and that he took an affirmative act to facilitate or encourage the use of a gun.

As discussed above, there is sufficient evidence to support a jury's finding that Carter participated in the July robbery, either by acting as a getaway driver or by watching the police station to monitor officers' comings and goings, or both. There is also sufficient evidence to support a finding that Carter knew about and facilitated the use of a gun in the September robbery. There is no direct evidence, however, that Carter knew of or facilitated Thompson's use of a gun in the July robbery.

*United States v. Isaacs*, 2006 WL 616036 (5th Cir. Mar. 13, 2006) (per curiam) (unpublished), bears many factual similarities to the instant case. In *Isaacs*, the defendant argued that there was no affirmative link between him and the use of a gun in two bank robberies for which he acted as a getaway driver. *Id.* at *3. The court noted that the defendant confessed that he "participated in robberies during which [his partner] used a firearm, knowingly conveyed to and from the robberies the firearm that was to be used in the robberies, and also independently transported a firearm in a vehicle while not in [his partner's] presence." *Id.* We held that this evidence was sufficient to support the conviction.

The critical difference between *Isaacs* and this case, however, is that in *Isaacs*, the defendant admitted that he knew guns were being used in the bank robberies, whereas here there is only limited circumstantial evidence that Carter knew a gun was being used in the July robbery. A reasonable trier of fact could conclude that Carter participated in both robberies and that he knew a gun would be used in the later crime. Knowledge that a gun was used in the second robbery, however, is not conclusive evidence of knowledge that it would be used in the first. Moreover, the perpetrators evidently believed when planning the July robbery that only one bank employee would have to be subdued in the course of the crime, which by itself would not necessarily require the use of a gun.[4] We hold that "[a] reasonable trier of fact would have to conclude that a reasonable doubt existed" that Carter knew that a gun was used in the first robbery. *United States v. Menesses*, 962 F.2d 420,

---

[4] Kitzman's testimony that he had to inform Thompson that he could not open the vault by himself indicates that the Defendants thought Thompson would only have to interact with one person in the course of the crime.

427 (5th Cir. 1992). Accordingly, Carter's conviction on Count II must be reversed.[5]

III

Defendants challenge their sentences as well as their convictions. They argue that the district court erred by imposing a higher minimum sentence for a second or subsequent § 924(c)(1) conviction when both convictions were obtained in a single criminal proceeding. *See* 18 U.S.C. § 924(c)(1)(A)(I) and (iii) and (c)(1)(C)(I) (establishing that the minimum sentence for a § 924(c)(1) conviction is five years, but that a second or subsequent conviction under § 924(c)(1) carries a minimum of twenty-five years). This argument is foreclosed by Supreme Court and Fifth Circuit precedent. *See Deal v. United States*, 508 U.S. 129, 132 (1993) (holding that convictions on multiple counts of violating § 924(c) contained in a single indictment will trigger the enhanced minimum sentence of § 924(c)(1)(C)(I)); *Lopez-Urbino*, 434 F.3d at 761 (stating that *Deal* has not been overruled and is therefore still valid precedential authority). The district court did not err in applying the mandatory minimum.[6]

Defendants next contend that the district court erred in enhancing their sentences when various sentencing factors were not contained in the indictment and/or found by the jury beyond a reasonable doubt. Specifically, they complain that the indictment should have charged and the jury should have found beyond a reasonable doubt: a second or subsequent § 924(c) violation; that Thompson had a prior conviction for brandishing a firearm in a crime of violence; and that Thompson

---

[5] Because we hold that the evidence could not support a jury's finding beyond a reasonable doubt that Carter knew a gun was used in the July robbery, we express no opinion on the holding in *Isaacs* that the "affirmative act" requirement is met when the defendant's only connection to the gun is knowingly transporting it to or from the scene of the crime.

[6] Of course, because one of Carter's § 924(c) convictions must be vacated, he will no longer come under § 924(c)(1)(C)(I).

-11-

used physical restraint during the robberies.[7] Defendants rely exclusively on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) in support of their position. In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The Defendants, however, were sentenced after the Supreme Court, in *United States v. Booker*, 543 U.S. 220 (2005), rendered advisory the United States Sentencing Guidelines. *Id.* at 259. After *Booker*, "[t]he sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline sentencing range." *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005). Each of the facts cited by the Defendants was relevant only to sentencing and did not increase their potential sentence under the advisory regime.[8] Accordingly, we find no error in the district court's enhancing the Defendants' sentences on the basis of facts not charged in the indictment and/or found by the jury beyond a reasonable doubt.

Finally, Thompson argues that the district court erred in calculating his sentence under U.S.S.G. §§ 4B1.1 and 5G1.2. He argues that these provisions require the district court first to generate the appropriate Guideline range and sentence and then to apportion that sentence among the various counts, making sure that any mandatory minimums are satisfied. He claims that the district court in this case merely determined a sentence for each count individually and then added them together.

---

[7] Defendants preserved this argument with respect to at least one of these facts, but not all of them. Because we find that the district court did not err, we need not determine which arguments will be reviewed *de novo* and which will be reviewed for plain error.

[8] With respect to the second or subsequent conviction under § 924(c), we also note that we have previously held that *Apprendi* does not apply to facts that increase the mandatory minimum as opposed to the statutory maximum. *United States v. Smith*, 296 F.3d 344, 348-49 (5th Cir. 2002).

The record reveals, however, that the district court actually followed the procedure urged by Thompson. First, it determined that Thompson's offense level for Counts I and III was 34 and that his criminal history category was Category VI. Then it applied § 4B1.1(c)(2)(A), which requires the court to add "the mandatory minimum sentences required by 18 U.S.C. § 924(c) to the minimum and maximum of the otherwise applicable guideline range determined for the counts of conviction other than the 18 U.S.C. § 924(c)." U.S.S.G. § 4B1.1(c)(2)(A). Thompson was required to receive at least 84 months for the first § 924(c) conviction and 300 months for the second. For an offense level 34 with a criminal history Category VI, the guideline range is 262-327. Adding that range to the required 384 months yields a range of 646-711, the one calculated by the district court. The district court then allocated the sentence among the various counts: 262 months for Counts I and III, to be served concurrently; 84 months for Count II, to be served consecutively; and 300 months for Count IV, to be served consecutively. This allocation comports with § 5G1.2(e), which states that the total punishment should be apportioned among the various counts, but that mandatory minimum sentences should be abided and made to run consecutively from any other count. Thompson has demonstrated no error in the manner in which the district court calculated his sentence and apportioned the sentence amongst the various counts.

IV

The Defendants have shown no error in the district court's rulings, except with respect to Carter's conviction on Count II of the indictment, which the evidence insufficiently supported. Accordingly, Thompson's conviction and sentence is AFFIRMED. Carter's conviction is affirmed as to Counts I, III, and IV, but his conviction as to Count II is REVERSED. His sentence is VACATED, and the case is REMANDED to the district court for entry of a judgment of acquittal

as to Count II and for re-sentencing.