**Antonio LANCASTER, Chanita L. Gayles, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 04–CF–508, 04–CF–943.**

District of Columbia Court of Appeals.

Argued March 24, 2009.

Decided July 9, 2009.

Mindy A. Daniels, appointed by the court, for appellant Lancaster.

M. Elizabeth Kent, appointed by the court, for appellant Gayles.

April E. Fearnley, Assistant United States Attorney, for appellee. Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Laura R. Bach, and J.P. Cooney, Assistant United States Attorneys, were on the brief.

Before WASHINGTON, Chief Judge, and KRAMER and OBERLY, Associate Judges.

OBERLY, Associate Judge:

On November 18, 2003, following a two-day jury trial, appellants Antonio Lancaster and Chanita L. Gayles were convicted of armed robbery in violation of D.C.Code §§ 22–2801 (2001) and 22–4502 (2001), assault with a dangerous weapon (ADW) in violation of D.C.Code § 22–402 (2001), and possession of a firearm during a crime of violence (PFCV) in violation of D.C.Code § 22–4504(b) (2001).[1] Lancaster was tried and convicted as a principal and Gayles was tried and convicted on the theory that she aided and abetted the armed robbery and PFCV offenses committed by Lancaster.

On appeal, Lancaster's sole argument is that there was insufficient evidence to establish beyond a reasonable doubt that he was guilty of armed robbery. Gayles presents two issues on appeal. First, she argues that the trial court's jury instructions on the charge that she aided and abetted armed robbery constituted plain error in light of this court's decision in *Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc). Second, she argues that there was insufficient evidence of her aiding and abetting both armed robbery and PFCV.

We affirm Lancaster's convictions as well as Gayles's conviction on the armed robbery count, but we reverse Gayles's conviction on the charge of aiding and abetting PFCV.

## I. FACTUAL SUMMARY

On August 2, 2003, Marvin Greene was driving his van along Benning Road in Southeast, Washington, D.C., when he saw appellant Chanita Gayles standing in front of her apartment building. Greene stopped his vehicle and spoke with Gayles, and the two agreed that Greene would pay Gayles for sex. Greene requested that they go to a motel, but Gayles instead suggested that they go to her apartment, where she lived alone and where, she assured Greene, "it was safe." Greene agreed, and Gayles told him he should park behind the apartment building. Greene parked his van as Gayles suggested and walked around to the front of the building. Gayles met Greene at the end of the building and the two walked together into the building and up the stairs to Gayles's apartment. Once inside the apartment, Gayles told Greene she needed to go outside to see a neighbor. Greene encouraged her not to leave the apartment and showed her some of his money, saying, "I will take care of you if you take care of me." Despite Greene's protests, Gayles left the apartment. Greene locked the door behind Gayles and waited in the living room until her return about five minutes later.

When Gayles returned, she knocked on her door. Greene looked through the peephole, saw only Gayles and opened the door. Gayles ran into the apartment toward the bathroom and, for reasons not

---

**1.** At sentencing, the government conceded that appellants' ADW convictions merged with their armed robbery convictions.

described in the record, vomited. Three men directly followed Gayles into the apartment. One of the men asked Gayles if she was alright, then another man, whom Greene later identified as Lancaster, turned to Greene, pulled out a gun and told him to "[g]ive it up." At this point, Greene saw that each man had a gun. While Lancaster was talking to Greene, Gayles was standing in the bathroom, watching the confrontation. Greene attempted to get to the door to escape, but two of the men pushed him into a closet space and threatened him with their guns. The men repeated that they wanted Greene to "give it up" so Greene took money, his car keys and a small knife from his pocket and threw the items on the floor. One of the men said, "I know you got more. Give it up, give it up." Two of the men put their guns to the back of Greene's head, saying "We going to kill this guy" so Greene withdrew $200 he had placed in his boots and threw that money to the floor. The men then told Greene to take his clothes off. The men also told Gayles to get out of the apartment, and she left. After Gayles exited, the three men gathered up the items from the floor, looked at each other, started laughing and then left the apartment.

Greene put his clothes back on, looked through the peephole to make sure the armed men were not lying in wait, and left the apartment. He subsequently called the police from a pay phone at a nearby gas station. He stayed there until two police officers arrived to interview him, approximately 30 minutes after the robbery. During this interview, Greene gave a description of the three men who robbed him and the woman who was present during the robbery. The police officers took Greene to the police station, where detectives interviewed him about the crime.

The detectives then took Greene back to Benning Road in their unmarked police car to try to find the suspects. As they drove past the apartment building in which Greene was robbed, Greene identified Gayles and Lancaster, who were standing outside of the building. The detectives drove the unmarked car to the back of the building and, while waiting there for other units to respond, Greene and the detectives saw Lancaster start to jump out of a window. Lancaster saw the waiting police officers and retreated back into the building. Police officers brought both suspects in front of Greene, and he identified them as two of the four people who were involved in the robbery.

During the apprehension of the suspects, Greene noticed that his van was not where he had left it parked behind the apartment building. The police found the van abandoned near RFK Stadium and contacted Greene three days after the robbery to tell him where and how to recover it.

## II. ANALYSIS OF ISSUES ON APPEAL

### A. Lancaster

■ As noted, Lancaster's only argument is that there was insufficient evidence to establish beyond a reasonable doubt that he was guilty of armed robbery. He focuses his challenge on the sufficiency of the identification evidence to link him to the crime. We find no merit to his challenge.

■ In considering sufficiency of the evidence when identification is at issue, we must focus on the reliability of the identification. If, as here, there was only one eyewitness to the crime, "the test is whether a reasonable person could find the identification convincing beyond a reasonable doubt, given the surrounding circum-

stances." *Beatty v. United States*, 544 A.2d 699, 701 (D.C.1988), citing *Malloy v. United States*, 483 A.2d 678 (D.C.1984); *Smith v. United States*, 389 A.2d 1356 (D.C.1978). And we of course view the evidence in the light most favorable to the government, "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Williams v. United States*, 881 A.2d 557, 566 (D.C.2005), quoting *Gathy v. United States*, 754 A.2d 912, 917 (D.C. 2000) (internal quotations omitted).

In *Beatty*, we examined the reliability of a one-eyewitness identification by looking at several factors deemed probative of the witness's ability to make a meaningful identification. We took into account the witness's opportunity to observe and the length of time of the observations, the lighting conditions, the length of time between the observations and the identification, the stimuli operating on the witness at the time of the observation, and the degree of certainty expressed by the witness in making the identification. 544 A.2d at 701.

In this case, Greene was able to observe Lancaster and the other robbers at close range during the robbery and he saw the men pull out their guns. Although there was no trial testimony about the lighting conditions in the apartment, Greene described the apartment as "open" and testified that there were no doors on the closet into which he was pushed. Greene was able to describe Lancaster's build, complexion, and clothing when he gave an account of the robbery to police about thirty minutes after the robbery took place. Greene did acknowledge that he was "jittery" during the robbery, and that he was "losing it," but he testified that he

was able to observe Lancaster and described not only the way Lancaster loaded his gun and pointed it at Greene's head, but also the types of guns each robber used. Finally, Greene expressed no uncertainty when identifying Lancaster on the street later the same night of the robbery. As he rode by in the unmarked police car, Greene pointed out Lancaster and said, "Well, that's the gentleman right there." Later the same evening, Greene identified Lancaster on the street.

Based on these facts, we conclude that there was sufficient evidence from which a reasonable juror could convict Lancaster of armed robbery beyond a reasonable doubt. As we held in *Hill v. United States*, 541 A.2d 1285, 1288 (D.C.1988), "the identification testimony of a single eyewitness is sufficient to sustain a conviction" and, as was the case in *Hill*, we find nothing in Greene's testimony or the circumstances surrounding the robbery that render Greene's identification of Lancaster so unreliable that the case should not have gone to the jury. *Id.* Given Greene's opportunity to observe Lancaster during the robbery and the description Greene gave of Lancaster to the police, we find there was sufficient evidence of Lancaster's identity. The trial court's denial of Lancaster's motion for judgment of acquittal was correct.

## B. Gayles

### 1. Erroneous Aiding–and–Abetting Jury Instructions

■ The government concedes that the trial court's jury instructions on aiding and abetting armed robbery were plain error in light of this court's decision in *Wilson–Bey v. United States*, 903 A.2d 818 (D.C. 2006) (en banc).[2] Here, the trial court instructed the jury:

**2.** Although this court decided *Wilson–Bey* in    2006, that decision applies to Gayles's case

[i]t is not necessary that the defendant have had the same intent that the principal had when the crime was committed or that he or she had the intent to commit the particular crime committed by the principal offender.

An aider and abettor is legally responsible for the acts of other persons in which he or she intentionally participates.

The government concedes that under *Wilson–Bey* these instructions improperly authorized the jury to find Gayles guilty of aiding and abetting armed robbery without proof that Gayles herself had the essential *mens rea* to commit the crime. *Wilson–Bey*, 903 A.2d at 838.[3] The government also concedes that the error is "plain" for purposes of appellate review,[4] but argues that reversal is not appropriate here because the error did not affect Gayles's substantial rights. To meet that test, Gayles must demonstrate that the error had a reasonable probability of having a prejudicial effect on the outcome of her trial, and that the error "seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Comford v. United States*, 947 A.2d 1181, 1189–90 (D.C.2008).

Gayles fails to meet this burden. Even without the erroneous instruction, we think a reasonable juror could conclude from Gayles's behavior that she shared the principals' specific intent to rob Greene, and thus was guilty of aiding and abetting the armed robbery. While Gayles and Greene were discussing their transaction, Greene suggested they go to a hotel, but Gayles insisted they go to her apartment, where, she assured Greene, it was "safe." She instructed Greene where he should park his van, which was stolen after the robbery with keys he surrendered to the robbers. After they went to her apartment, Gayles told Greene she had to step out of the apartment for a moment (over Greene's objections) and when she returned a few minutes later, she was followed by three armed men who robbed Greene at gunpoint. In light of this evidence, we hold that the erroneous jury instruction did not have a reasonable probability of affecting the outcome of Gayles's trial, and we affirm Gayles's conviction for aiding and abetting armed robbery.

## 2. Sufficiency of the Evidence

■ Like Lancaster, Gayles challenges the sufficiency of the evidence to convict her. First, she argues that her "mere presence" during the armed robbery did not aid or abet the commission of that crime, and so she should have been acquitted on that count. Second, even if the jury could find that she participated in the armed robbery as an aider and abettor, the government still was required to prove that she aided and abetted the *possession* of a firearm during a crime of violence (the

because her case was pending on appeal and not yet final in 2006. *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding that a new rule for the conduct of criminal prosecutions applies retroactively to all cases, state or federal, pending on direct review or not yet final).

**3.** Implementing *Wilson–Bey*, the 2008 version of the standard aiding-and-abetting jury instruction states that "the government must prove beyond a reasonable doubt that the defendant personally acted with [*insert mens*

*rea required for the charged offense* ]." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (4th ed. 2008) ("Aiding and Abetting").

**4.** In a case such as this one, where the law was settled at the time of trial in 2003, but contrary to the law at the time of appeal in 2009, "it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

armed robbery) to support her conviction for aiding and abetting Lancaster's PFCV violation. She argues that there was insufficient evidence to allow a reasonable juror to find her guilty of aiding and abetting Lancaster's *possessory* offense.

In general, to prove aiding and abetting, the government must show that (1) a crime was committed by someone; (2) the accused assisted or participated in its commission; and (3) the accused participated with guilty knowledge. *Tyree v. United States*, 942 A.2d 629, 636 (D.C. 2008). Because armed robbery is a specific-intent crime, the government must prove that the aider and abettor shared the same *mens rea* required of the principals—in this case, the specific intent to steal from Greene. *See Walters v. United States*, 940 A.2d 101, 102 (D.C.2007) (holding that *Wilson–Bey* applies to specific-intent crime of robbery).

We agree with Gayles that her "mere presence" during the robbery would have been insufficient to prove her intent to rob Greene, but in this case the government established far more. The government presented evidence that Gayles "lured" Greene into her apartment, then left, returning a few minutes later followed by three armed men, who then robbed Greene at gunpoint. While Gayles vomited in the bathroom, one of the robbers asked her if she was alright, indicating that the robbers were acquainted with Gayles and concerned for her. A few minutes later, Gayles stood by and watched the robbers threaten Greene, and then she left the apartment at their direction. Taken in the light most favorable to the government, a reasonable juror could find that Gayles knew the robbers and shared their intent to rob Greene. The trial court did not err in denying Gayles's motion for a judgment of acquittal on the charge of aiding and abetting armed robbery.

We reach a different conclusion as to Gayles's motion for a judgment of acquittal on the charge of aiding and abetting PFCV. The government cites *Dang v. United States*, 741 A.2d 1039 (D.C.1999), for the proposition that it must show only that Gayles knowingly acted in furtherance of the "common purpose" to rob Greene— the predicate "crime of violence" for the PFCV charge against Lancaster—to support her conviction for aiding and abetting PFCV. In *Dang*, this court upheld the sufficiency of the evidence to support Dang's conviction for aiding and abetting his co-defendants' possession of their guns during an armed robbery. The court noted that although there was no evidence that Dang himself possessed a gun during the robbery, he entered and exited the apartment with his co-defendants and he "worked in concert with them by . . . blocking the door, guarding [a victim] and pointing a knife at [another victim]." *Id.* at 1043. From these facts the court concluded that a reasonable juror could find that Dang aided and abetted his co-defendants' possession of firearms. *Id.*

Although we do not believe it is enough that one charged with aiding and abetting the crime of PFCV "work in concert" with the principal in the commission of the predicate *crime of violence* (here, the armed robbery), the facts in *Dang* establish that Dang did much more than that. Dang also took specific steps to assist his co-defendants in the actual *possession of firearms*. As the government argued in its brief in *Dang*, Dang's concrete actions of blocking the door, guarding a victim, and pointing a knife at another victim "assisted the principals in *maintaining possession* of the guns" by "preventing the victims from grabbing the gun[s] or from obtaining outside help."

In the present case, by contrast, the government offered no proof that Gayles did anything at all to aid in *the possession*

of a firearm by any of the robbers. On the contrary, Gayles did nothing after she lured Greene into her apartment. She did not "block the way" to prevent Greene from leaving and she did not "guard" or threaten him. Instead, she merely stood in the bathroom in her apartment watching the confrontation between Greene and the robbers for a brief time until she followed the robbers' directive to leave the apartment.

Thus, we do not find *Dang* controlling here. Instead, this case much more closely resembles *McCoy v. United States,* 760 A.2d 164 (D.C.2000). In *McCoy,* we held that for a defendant to be convicted of aiding and abetting the crime of carrying a pistol without a license (CPWOL), a possessory offense similar to PFCV, "there must be a showing of some conduct by an alleged accomplice of an affirmative character in furtherance of the *act of carrying the pistols* by the principals." *Id.* at 186, quoting *Halicki v. United States,* 614 A.2d 499, 503 (D.C.1992) (emphasis added) (internal quotation marks omitted). In *McCoy,* we reversed the trial court's judgment, rejecting the government's reliance on evidence of defendants' participation in a "larger scheme" to murder the victim as sufficient to support their convictions for aiding and abetting CPWOL. We explained that under *Halicki* the government must show more than "general participation in the criminal venture" to prove aiding and abetting of the possessory firearms offense. *McCoy,* 760 A.2d at 186.

In this case, as in *McCoy,* the government relies solely on evidence of Gayles's participation in the "larger scheme" of the armed robbery to support her conviction for aiding and abetting the robbers' PFCV. As noted above, the government presented no evidence that Gayles engaged in any conduct that aided in the *possession of a firearm by any of the robbers.* In response to questioning at oral argument as to where in its brief the government explained the requirements for aiding and abetting the *possession* of a firearm during a crime of violence, the government submitted a post-argument letter again referring the division to the pages of its brief that argued merely that Gayles knowingly acted in furtherance of a "common purpose" to rob Greene. That evidence establishes that Gayles was properly convicted of aiding and abetting armed robbery, but it says nothing about her assistance or participation in the robbers' possession of firearms.[5]

Thus, the type of evidence that was sufficient to support affirmance of the conviction in *Dang* is missing here, nor can the government's theory in this case—that participation in the "larger scheme" is sufficient—be reconciled with the principle articulated in *McCoy* as applied in a CPWOL case. The inconsistency urged upon us by the government is made especially stark by our acknowledgment in *Halicki* that we have sometimes "equated the concepts of 'carrying on or about the person' and 'possession' by using the terms interchangeably." *Halicki,* 614 A.2d at 503 n. 9.[6] We find *McCoy's* analysis of the proof required to support a charge of aiding and abetting the possessory offense of CPWOL persuasive because it gives mean-

5. The government also relies on the same pages of its brief to refute the argument that it needed to prove that Gayles herself constructively possessed a firearm. We agree that the government need not prove constructive possession, but it still must prove some act on Gayles's part that assisted the robbers in *their* possession of firearms during the armed robbery.

6. The statutory definition of PFCV requires (1) possession of a pistol, machine gun, shotgun, rifle, or other real or imitation firearm and (2) the commission of a crime of violence as enumerated in D.C.Code § 22–4501(f). The statutory definition of CPWOL is (1) car-

ing to the language of the offense, and we believe the facts in *Dang* show that the government there presented the same nature and quantum of proof as the court required in *McCoy*.[7] That is appropriate because there is no meaningful distinction between what should be required to uphold a charge of aiding and abetting these two very similar possessory offenses. We therefore reverse Gayles's conviction on the charge of aiding and abetting PFCV.[8]

*Affirmed in part and reversed in part.*

rying, either openly or concealed, on or about their person, a pistol (2) without a license issued pursuant to District of Columbia law. *See* D.C.Code §§ 22–4504(a) and (b). Of course, the licensing requirement of CWPOL is not implicated in the present case.

7. Our view is consistent with that of numerous federal courts of appeal interpreting 18 U.S.C. § 924(c), which imposes an additional penalty for the use, carrying or possession of a firearm during a federal crime of violence. The majority of the circuit courts require the government to present evidence that the aider and abettor did something to facilitate the principal's possession of the firearm. *See, e.g., United States v. Otero–Mendez,* 273 F.3d 46, 52 (1st Cir.2001) ("[T]he prosecution must prove [1] that appellant knew a firearm would be carried or used in a crime of violence and [2] that he willingly took some action to facilitate that carriage or use."); *United States v. Medina,* 32 F.3d 40, 45 (2d Cir.1994) (holding that to support an aiding and abetting conviction under § 924(c) the government must prove a defendant "performed some act that directly facilitated or encouraged the use or carrying of a firearm"); *United States v. Thompson,* 454 F.3d 459, 465 (5th Cir.2006) (mandating the government "prove [1] that the defendant acted with the knowledge or specific intent of advancing the 'use' of a firearm" and [2] perform "some affirmative act relating to the firearm," *i.e.,* that "the defendant took some action to facilitate or encourage the use or carrying" of the gun);

*United States v. Robinson,* 389 F.3d 582, 591 (6th Cir.2004) ("[T]he [G]overnment must prove that the defendant both [1] associated and [2] participated in the use of the firearm in connection with the underlying crime."); *United States v. Daniels,* 370 F.3d 689, 691 (7th Cir.2004) ("The defendant must [1] know, either before or during the crime, that the principal will possess or use a firearm, and then [2] after acquiring knowledge intentionally facilitate the weapon's possession or use."); *United States v. Bancalari,* 110 F.3d 1425, 1430 (9th Cir.1997) ("[T]he defendant must have directly facilitated or encouraged the use of the firearm and not simply be aware of its use."); *Bazemore v. United States,* 138 F.3d 947, 949 (11th Cir.1998) (requiring [1] knowledge that a gun was used in the underlying crime, and [2] that there be "some proof linking the defendant to the gun"). *But cf. United States v. Bowen,* 527 F.3d 1065, 1079 (10th Cir.2008) (noting that the 10th Circuit "currently require[s] only that an aider and abetter (1) know a cohort used a firearm in an underlying crime of violence, and (2) knowingly and actively participate in that underlying crime," but analyzing the facts of the case using the majority approach).

8. Gayles was sentenced to five years' imprisonment on each of the armed robbery and PFCV counts, the sentences to run concurrently, followed by five years of supervised release. Accordingly, our reversal of her conviction on the PFCV count does not require a remand for resentencing.