FILED
United States Court of Appeals
Tenth Circuit

**June 2, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

AARON R. BOWEN, also known as
Aaron Seicrest,

      Defendant-Appellant.

No. 07-1216

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 05-cr-00425-REB)**

---

Susan L. Foreman, Denver, Colorado, for Defendant-Appellant.

Andrew Vogt, Assistant United States Attorney (Troy A. Eid, United States
Attorney, with him on the briefs), Denver, Colorado, for Plaintiff-Appellee.

---

Before **MURPHY**, **MCKAY**, and **BALDOCK**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

A grand jury issued a Second Superseding Indictment charging Defendant

Aaron Bowen with (1) Aiding and Abetting the Retaliation Against a Witness, in

violation of 18 U.S.C. §§ 1513(b)(2) & 2; (2) Conspiracy to Retaliate Against a

Witness, in violation of 18 U.S.C. §§ 1513(b)(2) & 371; and (3) Aiding and Abetting

the Possession and Brandishing of a Firearm in Furtherance of a Federal Crime of

Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) & 2. A petit jury convicted Bowen on all counts. On appeal, Bowen raises three points of error. First, Bowen argues the district court erred in ruling that the use of a firearm as a club constituted "brandishing" of a firearm, rather than mere "use" of a firearm, under the meaning of 18 U.S.C. § 924(c)(1)(A). Second, Bowen maintains that the evidence presented at trial was insufficient to support his conviction under 18 U.S.C. § 924(c)(1)(A). Third, Bowen requests we remand this case with instruction to the district court to conform its written judgment to the lower sentence the district court announced at sentencing. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1). We **affirm** Bowen's conviction under 18 U.S.C. § 924(c)(1)(A), and **remand** for the district court to bring its written judgment into conformity with its previously imposed, oral sentence.

I.

We review the sufficiency of the evidence in the light most favorable to the Government. See United States v. Castorena-Jaime, 285 F.3d 916, 933 (10th Cir. 2002). Accordingly, the factual summary offered below is taken directly from the testimony of the Government's two primary witnesses at trial, Clifford Cline and Marissa Yingling-Winbush. Where the accounts of these witnesses diverge, we set forth the facts as described by Cline, the victim in this case.

Clifford Cline worked as a truck driver and dispatcher. Cline befriended his coworker Dawnese Yingling (Yingling), who introduced him to the use of

methamphetamines. When Cline fell on hard times, Yingling allowed him to move into her home. Yingling resided in a mobile home situated in a mobile home park outside Denver, Colorado. Also periodically living with Yingling was her daughter Marissa Yingling-Winbush (Winbush).[1]

While living with Yingling, Cline met and formed a relationship with Holly Siltz, another resident of the mobile home park. Cline eventually moved in with Siltz, who shared a mobile home with her daughter, Laray, and several other persons. Joshua Hall (Hall), Laray's boyfriend, was one of the individuals periodically living in Siltz's home. During the time in which Cline lived with Siltz, Cline witnessed several of Hall's associates visiting Hall at the mobile home park. These associates included Defendant Aaron Bowen, Lenny Gooden, and Hall's brother, Michael Hall.

In partial payment for his board, Cline gave Hall and Laray the use of his second vehicle, a station wagon. Hall, in turn, lent the station wagon to his brother Michael. Police stopped Michael Hall while he was driving the station wagon and arrested him, impounding the car. Officials phoned Cline to inform him of his car's location and explained to him how he could retrieve it. Hall, Laray, and Cline then pooled their money and reacquired the station wagon. Subsequently, Cline returned the vehicle to Hall and Laray.

---

[1] In its briefs, the Government refers to Ms. Winbush as "Ms. Windbush." Because the trial transcript indicates that the witness in question spells her own name as "Winbush," we adopt that spelling here.

A month later, Cline received a phone call from an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) regarding a sawed-off shot gun officers had found in his vehicle. Cline disclaimed any knowledge of the gun and, at the agent's request, agreed to give ATF a statement to that effect. Hall, the subject of several outstanding arrest warrants, was present during this conversation, which took place in Siltz's mobile home. Because Hall did not want his name involved in ATF's investigation, he and Cline agreed that Cline would tell ATF he lent the station wagon directly to Michael Hall.

To ensure Cline stuck to this story, Hall asked Siltz to accompany Cline when he visited ATF's office. ATF personnel, however, separated Siltz from Cline during his interview. This angered Siltz because she was unable to hear what Cline told government officials. On Cline and Siltz's return to the mobile home park, Hall extensively questioned Cline as to the content of his statement. Cline assured him that he told ATF agents he had lent the station wagon directly to Michael Hall.

Thereafter, Hall periodically sought reassurances from Cline that he had, in fact, stuck to their agreed upon tale. One day, while Cline was watching television with Siltz, Hall approached Cline from behind and struck him over the head several times, without apparent provocation. Hall accused Cline of breaking their agreement and threatened to harm Cline's father and children, who were in foster care. Cline responded by contacting ATF and informing an agent that Hall and his associates were stealing money from drug dealers. Subsequently, Cline began to distance

4

himself from his acquaintances at the mobile home park, often choosing to stay, instead, with his father.

Some time later, Winbush and Hall checked into a motel for a few days. During the second day of their stay, Winbush commented to Hall that she had received a phone message from Cline. Hall asked Winbush to ask Cline to come to the motel. Hall wished to question Cline about what he told ATF regarding his brother Michael. Hall indicated that if he didn't "do something about Cline" his brother might "do something worse." Subsequently, Winbush called Cline and asked him to come to the motel. Cline came to the motel and entered Winbush's room. Winbush then closed and locked the door behind him.

At this point, Hall emerged from the bathroom holding a gun and instructed Cline to sit on the bed. Cline complied and Hall situated himself on a chair placed between Cline and the door. During this encounter, Hall pulled the clip out of his gun two to three times and then pushed it back in – revealing the clip was fully loaded. Hall proceeded to question Cline about his involvement with ATF, implying that Cline was a law enforcement "snitch." When Cline denied working for ATF, Winbush called him a liar and Hall struck him with his fists and the gun.

Subsequently, Hall used Winbush's cell phone to make a call to an unknown associate. Hall requested that this individual come to the motel, explaining "we have

5

another one, hostage, remember that guy Cliff?"[2]  Shortly thereafter, Defendant Aaron Bowen, Lenny Gooden, and Travis Miller appeared at the motel room.  After they had entered the room, Hall mentioned ATF.  Bowen then pointed to Cline and asked "is that the guy?"  Hall responded in the affirmative.  Cline testified that Bowen, Gooden, and Miller appeared angry and that they did not seem surprised to find him in a captive state.[3]

After the arrival of his associates, Hall again accused Cline of being a law enforcement snitch.  When Cline denied this charge, Defendant Bowen struck Cline with his fists and feet.  Hall joined in, striking Cline with his fists.  Cline testified that he was "90 percent" certain that Hall also used the pistol to strike him at some point after Bowen entered the hotel room.  The volume of Cline's screaming eventually began to concern his assailants.  An unknown individual placed a pillow over Cline's face and told him to be quiet, as the beating continued.  Periodically, Hall also gave methamphetamines to Cline in order to calm him.

Cline eventually tried to escape by hurling himself at a window.  But the window held, bouncing an injured Cline back into the motel room.  For this attempt

---

[2]  Hall's reference to a previous hostage refers to an unrelated occurrence in which Hall and Travis Miller apparently traveled to Utah to kidnap Miller's former girlfriend.

[3]  Additional evidence established that Hall often carried a firearm.  Cline testified that he had seen Hall with a gun "dozens of times."  Bowen also admitted to Agent Kopeck that Hall "always carrie[d] a firearm."  Agent Kopeck discussed Bowen's statement in his testimony at trial.

at escape, Hall and Bowen administered an additional beating to Cline. Still concerned that the noise resulting from Cline's cries may have attracted unwanted attention, Hall and his associates decided to leave the motel. Bowen and Miller left first, followed by Gooden. Then Winbush, Cline, and Hall exited the motel room with Hall positioning himself behind Cline. Cline and his captors then entered the parking lot.

Defendant Bowen and Miller proceeded to situate themselves in Cline's truck. Hall had unintentionally broken a key off in the ignition of Cline's truck a month earlier. Hence, one had to start the truck in a peculiar way. Despite this oddity, Cline noted that Bowen and Miller had no difficulty starting and driving away in his vehicle. Subsequently, Gooden, Winbush, Cline, and Hall entered Gooden's car. Hall placed Cline in the front passenger seat and sat directly behind him. Gooden sat in the driver's seat and Winbush situated herself behind him. During the ensuing drive, Hall instructed Cline not to look out the window or signal for aid. Whenever Hall felt Cline was paying insufficient attention to his instructions, he struck Cline with the gun.

About fifteen minutes later, Gooden, Cline, Hall, and Winbush arrived at a mobile home belonging to Gooden's parents. They walked past Gooden's mother and into a living area in the rear of the trailer, in which they found Gooden's half-brother Dathan. A short time later, Defendant Bowen and Miller also appeared. Asked again whether he was working with ATF, Cline continued to proclaim his

7

innocence. This resulted in several additional beatings in which Hall, Bowen, and Dathan struck Cline. Hall also periodically used his gun to bludgeon Cline during these assaults. Eventually, Gooden put an end to the beating. At this point, Defendant Bowen inquired as to what Hall would like to do with Cline. Both Winbush and Cline testified that the import of Bowen's question was whether Hall wished to kill Cline. Hall declined.

Cline's captors then fabricated a story involving an attempted car jacking, which they instructed Cline to use as an explanation for his injuries. They placed a new shirt on Cline, started his truck, placed him in it, and told him to leave. Cline managed to drive to his father's home. Subsequently, an ambulance transported Cline to the hospital, where he was treated for a popped lung and rib fractures, among other injuries. Officials later obtained blood samples from the back room of the Goodens' trailer. Expert testimony presented at Bowen's trial linked the DNA derived from these blood samples to Cline. Ultimately, a jury convicted Defendant Bowen on three counts based on his participation in Cline's beatings.

## II.

We first consider whether use of a firearm as a club may constitute "brandishment" of a firearm under 18 U.S.C. § 924(c)(1)(A)(ii). Our review of a district court's interpretation of a federal statue is de novo. See United States v. Quarrell, 310 F.3d 664, 669 (10th Cir. 2002). The beginning of our interpretive inquiry is always the "plain language of the statute." United States v. Romero, 122

8

F.3d 1334, 1337 (10th Cir. 1997). If the terms of the statute are unambiguous, our inquiry ends and the plain meaning of the statute controls. See id.; Quarrell, 310 F.3d at 669.

Section 924(c)(1)(A) mandates an additional five years of imprisonment for any person who "uses" or "carries" a firearm "during and in relation to any [federal] crime of violence or drug trafficking crime," as well as for any person who "possesses" a firearm "in furtherance of any such crime." 18 U.S.C. § 924(c)(1)(A). This five year mandatory additional sentence is increased to seven and ten years, respectively, if a defendant brandishes or discharges the firearm. Id. § 924(c)(1)(A)(ii) & (iii). Thus, the closer a defendant comes to employing a firearm's deadly potential, the greater his additional sentence under § 924(c)(1)(A).

Under the terms of the statute, the question of whether a defendant has committed the substantive offense of using, carrying, or possessing a firearm is for the jury. See United States v. Nava-Sotelo, 354 F.3d 1202, 1205-06 (10th Cir. 2003). Whether the brandishing and discharge provisions of § 924(c) have been satisfied, however, is a sentencing determination made by the district court.[4] See id. ("[T]he Supreme Court has specifically held that § 924(c)'s brandishing and discharge provisions are 'sentencing factors to be found by the judge, not offense

---

[4] In this case, the district court erroneously presented the question of whether Bowen aided and abetted the "brandishing" of a firearm to the jury. Because Bowen does not challenge this error, we do not address it here.

elements to be found by the jury'" (citing <u>Harris v. United States</u>, 536 U.S. 545, 556 (2002)). For purposes of § 924(c), to "brandish" a firearm means to "display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person." 18 U.S.C. § 924(c)(4). Thus, in order to "brandish" a firearm a defendant must (1) display the firearm or make the presence of the firearm known to another (2) in order to intimidate that individual. <u>See</u> <u>United States v. Beaudion</u>, 416 F.3d 965, 968 (9th Cir. 2005).

Bowen claims the district court, in ruling that the use of a firearm as a club may satisfy § 924(c)'s brandishing provision, failed to adequately distinguish between the categories of "brandishing" and "use." More specifically, he alleges the district court's interpretation of "brandishing" was overly broad, in effect subsuming the distinct category of "use." Bowen also makes a textual argument more finely tailored to the facts of this case. He suggests that because the firearm in the underlying crime was used as a club to "retaliate" against Cline for his past actions, it was not used to "intimidate" Cline by coercing him either to perform, or abstain from, any present or future action. <u>See</u> American Heritage Dictionary (4th ed. 2004) (defining "intimidate" as to "make timid; fill with fear" or to "coerce or inhibit by or as if by threats"). Because § 924(c)'s definition of "brandishing" a firearm requires a defendant act with the intent to "intimidate" another, Bowen asserts that, at maximum, he is guilty of "using" a firearm during and in relation to

10

a federal crime of violence.  See 18 U.S.C. § 924(c)(4); United States v. Bolden, 479 F.3d 455, 461 (6th Cir. 2007) (defining "brandish" as "displaying a firearm with an intent to intimidate").

We disagree.  Given that § 924(c)'s brandishing provision operates as a sentencing enhancement, rather than an element of a crime, some overlap between the statutory terms "use" and "brandishing" is unavoidable.  See Nava-Sotelo, 354 F.3d at 1205-06.  Indeed, if a firearm has not been "used," "carried," or "possessed" within the meaning of § 924(c), no underlying crime exists on which to predicate a "brandishing" enhancement.  See id.  As § 924(c)'s statuory scheme makes clear, Congress simply viewed "brandishing" a firearm as a more egregious form of "using" such a weapon.[5]  See Bailey v. United States, 516 U.S. 137, 148 (1995)

_____

[5]  Section § 924(c)(1)(A) reads as follows:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime –
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(continued...)

11

(observing that "'use' certainly includes brandishing"). Accordingly, § 924(c) "creates a tiered framework" in which the two most serious "uses" of a firearm – brandishing and discharge – result in longer terms of imprisonment. <u>Beaudion</u>, 416 F.3d at 969.

In other words, "brandishing" constitutes a particular form of "use." <u>See</u> <u>id.</u> Of course, we do not mean to suggest that these terms completely overlap. While one necessarily "uses" a firearm while "brandishing" such a weapon, the converse is not true. <u>See</u> <u>id.</u>; <u>see also</u> <u>Bailey</u>, 516 U.S. at 148 (stating that "'use' certainly includes brandishing . . . a firearm"). One may "use" a firearm without "brandishing" the gun. <u>See</u> <u>Beaudion</u>, 416 F.3d at 969. An example of this type of "use" is when a defendant trades a gun for drugs. In this hypothetical, a defendant has clearly "used" a firearm, but his use of the gun was not intended to intimidate the recipient. <u>See</u> <u>Smith v. United States</u>, 508 U.S. 223, 233 (1993) (stating that no court has "ever held that trading a firearm for drugs falls short of being the 'use' thereof"). Consequently, such a defendant is not culpable of "brandishing." <u>See</u> <u>Beaudion</u>, 416 F.3d at 968-69.

Here, Bowen has presented no evidence to support his contention that the

---

[5](...continued)
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).

12

district court confused the terms of § 924(c). To the contrary, the district court correctly applied the statutory definition of "brandishing" in determining that an individual may brandish a firearm in using that weapon to strike another. See 18 U.S.C. § 924(c)(4). A defendant "brandishes" a firearm when he (1) displays the firearm, or makes the presence of the firearm known to another, (2) in order to intimidate that individual. Id. Striking an individual with a firearm will, in many instances, visibly display that firearm to the victim. Furthermore, clubbing a person with a firearm will often – if not always – "intimidate" the victim, not only causing him to fear for his personal safety, but also coercing him to comply with the will of his assailant. See American Heritage Dictionary (4th ed. 2004) (defining "intimidate" as to "make timid; fill with fear" or to "coerce or inhibit by or as if by threats"). We hold the district court correctly concluded that a defendant may "brandish" a firearm in using that weapon to strike another.

We now turn to Bowen's assertion that, under the facts of this case, Hall did not "brandish" a firearm within the meaning of § 924(c). Specifically, Bowen claims that Hall did not "brandish" a firearm because he did not intentionally use it to "intimidate" Cline. The foundation for this argument is Bowen's unstated assumption that the *only* intent relevant to our intimidation inquiry is the intent necessary to support his underlying conviction for retaliation.[6] But the

_____

[6] See, e.g., Appellant's Op. Br. at 26 ("The indictment charged only the
(continued...)

13

"intimidation" aspect of § 924(c)'s brandishing provision does not establish an element of an offense, which is somehow tied to the intent required to support a predicate conviction. See Nava-Sotelo, 354 F.3d at 1205-06. No distinct crime of "brandishing" exists under § 924(c). See Harris v. United States, 536 U.S. 545, 556 (2002); Nava-Sotelo, 354 F.3d at 1205-06. Rather, § 924(c)'s brandishing provision creates a *sentencing enhancement*, which a district court may apply based on a preponderance of the evidence.[7] See Harris, 536 U.S. at 551-52, 556.

We conclude that a preponderance of the evidence clearly supports the application of § 924(c)'s brandishing enhancement here. Cline witnessed Hall holding a firearm both in the motel and at the Goodens' trailer, fulfilling § 924(c)(1)(A)(ii)'s display requirement. Hall also struck Cline with the gun during multiple beatings. Indeed, Cline testified that after the first few beatings he "was scared" and that he viewed his unsuccessful attempt at jumping out of the hotel

---

[6](...continued)
retaliation offense. Thus, according to the jury's verdict [Hall's] use of the gun was not as display 'in order to intimidate,' but as a club to retaliate.").

[7]  In Harris, the Supreme Court affirmed a district court's application of a brandishing enhancement, based on judicial fact-finding. We recently acknowledged the continuing validity of Harris and its rule that "judicial fact-finding leading to a mandatory minimum sentence is permissible as long as the mandatory minimum sentence does not exceed the maximum sentence available under the jury's verdict." United States v. Holyfield, 481 F.3d 1260, 1262 (10th Cir. 2007) (citing Harris, 536 U.S. at 567-68). Importantly, the "maximum penalty" for a violation of § 924(c)(1) is "life imprisonment." United States v. Avery, 295 F.3d 1158, 1170 (10th Cir. 2002).

14

window as his "only chance."  The evidence presented at trial was thus sufficient to support a finding, by the district court, that Hall intentionally calculated his use of a firearm to "intimidate" Cline.  See  McLaughlin v. United States, 476 U.S. 16, 17-18 (1986) (recognizing that "the display of a gun instills fear in the average citizen").  For example, the district court could have properly concluded that Hall's use of a firearm (1) coerced Cline to submit to additional beatings, at the time of the assaults, and (2) caused Cline to fear that his personal safety would be further compromised, if he chose to provide information to government officials in the future.  See American Heritage Dictionary (4th ed. 2004) (defining "intimidate" as to "make timid; fill with fear" or to "coerce or inhibit by or as if by threats").

Bowen suggests that because Hall predominantly used the firearm in this case as a "club" it was not used to intimidate Cline as a "firearm."  We find Bowen's emphasis on the fact that Hall used the gun as a club – rather than merely displayed in a threatening manner – entirely misplaced.  A firearm's capacity for intimidation is *greater* when its deadly potential is displayed *and* its metal casing is used to pummel the victim, not less.  See McLaughlin, 476 U.S. at 18 (noting that "a gun can cause harm when used as a bludgeon"); cf. id. at 17 ("[A] gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place.").  The evidence presented at trial amply demonstrated that Hall intentionally displayed

15

a firearm in order to intimidate Cline. As a result, if Bowen aided and abetted Hall's use of the firearm, he is eligible for a sentencing enhancement predicated on Hall's "brandishing" of that weapon.

III.

We next consider whether the Government presented sufficient evidence at trial to support Bowen's conviction for aiding and abetting the use of a firearm during and in relation to a federal crime of violence. Bowen does not dispute that he participated in retaliating against a witness. Nor does he contest that retaliating against a witness is a crime of violence. Consequently, we examine only whether the Government presented sufficient evidence at trial to convict Bowen of aiding and abetting Hall's use of a firearm.

We review the sufficiency of the evidence supporting a criminal conviction de novo. See United States v. Triana, 477 F.3d 1189, 1194 (10th Cir. 2007). The scope of our inquiry is limited to determining whether a reasonable jury could find the defendant guilty beyond a reasonable doubt, if it viewed all direct and circumstantial evidence, as well as all reasonable inferences drawn from that evidence, in the light most favorable to the Government. See id. Thus, our review of the evidence the Government presented at trial is "highly deferential." United States v. Dowlin, 408 F.3d 647, 657 (10th Cir. 2005). We may not assess the credibility of witnesses or weigh conflicting evidence, as these tasks are exclusively for the jury. See United

16

States v. Banks, 451 F.3d 721, 725-26 (10th Cir. 2006). Accordingly, we may reverse "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 726.

Of course, we do ensure that inferences made by the jury to support a conviction amount to more than mere speculation. See Triana, 477 F.3d at 1194. Indeed, all inferences drawn by the jury must be reasonable. See id. An inference is reasonable where "a probability" exists that a "conclusion flows from the proven facts." United States v. Rahseparian, 231 F.3d 1257, 1262 (10th Cir. 2000). But an inference is unreasonable where the jury engaged "in a degree of speculation and conjecture that renders its findings a guess or mere possibility." Id. Accordingly, we will not uphold a conviction justified solely by "piling inference upon inference." United States v. Jameson, 478 F.3d 1204, 1208 (10th Cir. 2007). Rather, we require that substantial evidence support a conviction. See id. To be "substantial," evidence must be capable of raising more than "a mere suspicion of guilt." Id.

A.

Because Bowen may only be held vicariously liable for the firearms conviction at issue, and § 924(c)'s brandishing provision is merely a sentencing enhancement, we must consider whether the evidence presented at trial is sufficient to sustain a

predicate conviction for Hall's "use" of a firearm.[8]   Section § 924(c)(1)(a)

criminalizes the knowing use of a firearm during and in relation to a federal crime

of violence.  See Nava-Sotelo, 453 F.3d at 1205.  Bowen does not question that

retaliating against a witness is a federal crime of violence.  Rather, he argues that

Hall did not use a "firearm" during and in relation to such a crime.  This argument

is necessarily based on the same artificial "club" versus "firearm" distinction we

addressed previously.  See supra Part II (addressing Bowen's argument that because

Hall predominately used the gun as a "club" it was not used to intimidate Cline as

---

[8] A grand jury indicted Bowen for "possessing" and "brandishing" a firearm. Subsequently, the district court erroneously presented the question of whether Bowen aided and abetted the "brandishing" of a firearm to the jury.  See supra Part II (explaining that § 924(c)'s brandishing provision establishes a sentencing enhancement).  Thus, the petit jury found Bowen guilty of aiding and abetting the "possession" and "brandishing" of a firearm.  In making this determination, the petit jury necessarily concluded that Hall "used" the firearm during and in relation to a federal crime of violence.  See Bailey, 516 U.S. at 148 (noting that, under § 924(c), "use' certainly includes brandishing").  Hence, we analyze whether the Government presented sufficient evidence to support Bowen's conviction for aiding and abetting Hall's "use" of a firearm.  Our conclusion would remain the same if we were to assess whether Bowen was eligible for a brandishing enhancement based on a predicate conviction for "possession" of a firearm.  See United States v. Dare, 425 F.3d 634, 636-37, 641, 643 (9th Cir. 2005) (affirming the application of a brandishing enhancement  predicated on a defendant's plea of guilty to possession of a firearm).  To prove a defendant "possessed" a firearm in furtherance of a crime of violence the Government must demonstrate the firearm "furthered, promoted, or advanced" the crime.  United States v. Luke-Sanchez, 483 F.3d 703, 706 (10th Cir. 2007).  In other words, there must be "some nexus between the firearm and the underlying" crime of violence.  Id.  Here, Hall's possession of a firearm undoubtedly furthered his retaliation against Cline, making it less likely Cline would attempt to escape from, or resist, Hall's bludgeoning attacks.  See McLaughlin, 476 U.S. at 16, 17-18 (noting that "the display of a gun instills fear in the average citizen").

18

a "firearm").

A defendant may not escape liability under a firearms charge, however, simply by imposing a false label on a firearm.[9]  The fact that a gun is used as a club does not make it any less a gun.  See McLaughlin, 476 U.S. at 17 (stating that a "gun is an article that is typically and characteristically dangerous . . . and the law reasonably may presume that such an article is always dangerous . . . .").  Quite simply, a firearm has the capacity to shoot bullets; a club does not.  See American Heritage Dictionary (4th ed. 2004) (defining a "firearm" as a "weapon . . . capable of firing a projectile and using an explosive charge as a propellant" and a "club" as a "stout heavy stick . . . suitable for use as a weapon; a cudgel").  No court of appeals has ever held that "using a gun to pistol-whip a victim is anything but the 'use' of a *firearm*" and we will not be the first to deviate from this trend.  Smith, 508 U.S. at 233 (emphasis added).

Next, we must determine whether Hall used a firearm "during and in relation to" a federal crime of violence.  Section 924(c)'s  "during and in relation to" standard requires the Government to establish a "sufficient nexus" between the use of a firearm and the underlying crime of violence.  See United States v. Watson, 953 F.2d 406, 409 (8th Cir. 1992).  Here, the evidence presented at trial established a

---

[9]  Abraham Lincoln once posed the following riddle:  "How many legs does a dog have if you call the tail a leg?"  The answer is, of course, "four" because "calling a tail a leg doesn't make it a leg."  Lincoln's observation seems particularly apt here:  Calling a firearm a club doesn't make it a club.

sufficient nexus between Hall's use of the firearm and the underlying crime of retaliation. First, Hall used a firearm to injure Cline in retribution for Cline's perceived misdeeds. Second, Hall's use of a firearm to strike Cline deterred Cline from seriously resisting Hall's repeated assaults. See McLaughlin, 476 U.S. at 17-18 (noting that "the display of a gun instills fear in the average citizen"); cf. Banks, 451 F.3d at 726 ("[W]e have concluded that carrying a gun to deter interference with a drug trafficking crime is done during and in relation to the crime."). Accordingly, we hold the evidence was sufficient to establish that Hall used a firearm during and in relation to a federal crime of violence.

## B.

We now turn to Bowen's argument that the evidence presented at trial was insufficient to establish that he aided and abetted Hall's use of a firearm. Aiding and abetting and Pinkerton co-conspirator liability are alternative theories "by which the Government may prove joint criminal liability for a substantive offense."[10] United States v. Zackery, 494 F.3d 644, 649 (8th Cir. 2007). The Government presented

---

[10] In Pinkerton v. United States, 328 U.S. 640 (1946), the Supreme Court established that a participant in a conspiracy is liable for all of the reasonably foreseeable acts of his coconspirators, provided those acts are committed in furtherance of the conspiracy. See United States v. Lake, 472 F.3d 1247, 1265 (10th Cir. 2007). While an *agreement* to break the law is an essential component of coconspirator liability, no such agreement is required to render one liable as an aider and abettor. See United States v. Robertson, 473 F.3d 1289, 1292 (10th Cir. 2007); United States v. Pursley, 474 F.3d 757, 769 (10th Cir. 2007). Liability as an aider and abetter is based solely on the *act* of intentionally counseling, aiding, or assisting another in the commission of a crime. See Pursley, 474 F.3d at 769.

20

both theories at trial in support of Bowen's firearm conviction. Because we affirm Bowen's conviction under an aiding and abetting theory of liability, we need not decide whether Bowen was also liable for Hall's use of a firearm, as a coconspirator, under Pinkerton.

The federal aiding and abetting statute does not create an independent crime; instead, it simply abolishes the common law distinction between principals and accessories. See United States v. Cooper, 375 F.3d 1041, 1049 (10th Cir. 2004); see also 18 U.S.C. § 2. Thus, aiding and abetting liability allows a jury to hold an aider and abetter responsible for a substantive offensive to the same extent as a principal, even though his act was not the cause of the substantive harm. See United States v. Hatatley, 130 F.3d 1399, 1406 (10th Cir. 1997); see also United States v. Slater, 971 F.2d 626, 632 (10th Cir. 1992) ("Acts committed in furtherance of the commission of a crime by another constitute 'abetting.'"). Sheer happenstance, however, is insufficient to render an individual an aider and abetter, as more than mere presence at the scene of the crime is required. See United States v. Delgado-Uribe, 363 F.3d 1077, 1084 (10th Cir. 2004); United States v. Hanson, 41 F.3d 580, 582 (10th Cir. 1994).

To be liable for aiding and abetting, a defendant must (1) willfully associate himself with the criminal venture, and (2) seek to make the venture succeed through some action of his own. See United States v. Isaac-Sigala, 448 F.3d 1206, 1213

21

(10th Cir. 2006); United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005).

Unlike coconspirator liability, liability as an aider and abetter is not contingent upon a prior "agreement or conspiracy to perform" a criminal act.  United States v. Pursley, 474 F.3d 757, 769 (10th Cir. 2007); see also United States v. Blanton, 531 F.2d 442, 444 (10th Cir. 1975).  Intentionally aiding, counseling, or assisting another in the commission of a crime is all that is required.  See Pursley, 474 F.3d at 769.

One need not participate in an important aspect of a crime to be liable as an aider and abetter; participation of "relatively slight moment" is sufficient.  See Isaac-Sigala, 448 F.3d at 1213; United States v. Whitney, 229 F.3d 1296, 1303 (10th Cir. 2000).

Even mere "words or gestures of encouragement" constitute affirmative acts capable of rendering one liable under this theory.  Whitney, 229 F.3d at 1303.

We have established that a defendant is liable of aiding and abetting the use of a firearm during a crime of violence if he (1) knows his cohort used a firearm in the underlying crime, and (2) knowingly and actively participates in that underlying crime.  See United States v. Vallejos, 421 F.3d 1119, 1125 (10th Cir. 2005); see also United States v. Wiseman, 172 F.3d 1196, 1217 (10th Cir. 1999).  At trial, Cline testified that he was ninety percent certain that Hall struck him with a firearm after Bowen entered the hotel room and joined Hall's attack, and that Hall continued to strike him with a firearm after he and his captors reached the Goodens' trailer.

Taken in the light most favorable to the Government, this testimony is sufficient to establish that Bowen knew Hall used a firearm in assaulting Cline.  Cline further

22

testified that Bowen participated in assaulting him both in the hotel room and later in the Goodens' trailer, thereby providing ample evidence that Bowen knowingly and actively participated in the underlying crime of retaliation. Consequently, the evidence presented at trial is sufficient to support Bowen's conviction for aiding and abetting Hall's use of a firearm.

Bowen correctly points out that our standard for determining whether a defendant has aided and abetted another's use of a firearm during and in relation to a crime of a violence differs from the rules established by other courts. Indeed, many of our sister circuits require the Government prove not only (1) that an aider and abetter have knowledge that a cohort used a firearm in a crime of violence, but also that he (2) intentionally take some action to facilitate or encourage the use of the firearm.[11] We currently require only that an aider and abetter (1) know a cohort

---

[11] See, e.g., United States v. Otero-Mendez, 273 F.3d 46, 52 (1st Cir. 2001) ("[T]he prosecution must prove [1] that appellant knew a firearm would be carried or used in a crime of violence and [2] that he willingly took some action to facilitate that carriage or use."); United States v. Medina, 32 F.3d 40, 45 (2d Cir. 1994) (holding that to support an aiding and abetting conviction under § 924(c) the Government must prove a defendant "performed some act that directly facilitated or encouraged the use or carrying of a firearm"); United States v. Thompson, 454 F.3d 459, 465 (5th Cir. 2006) (mandating the Government "prove [1] that the defendant acted with the knowledge or specific intent of advancing the 'use' of a firearm" and [2] perform "some affirmative act relating to the firearm," i.e., that "the defendant took some action to facilitate or encourage the use or carrying" of the gun); United States v. Robinson, 389 F.3d 582, 591 (6th Cir. 2004) ("[T]he [G]overnment must prove that the defendant both [1] associated and [2] participated in the use of the firearm in connection with the underlying crime."); United States v. Daniels, 370 F.3d 689, 691 (7th Cir. 2004) ("The defendant must [1] know, either before or during

(continued...)

23

used a firearm in an underlying crime of violence, and (2) knowingly and actively participate in that underlying crime. See Vallejos, 421 F.3d at 1125. Thus, we have not required that a defendant's participation in the underlying crime directly facilitate the use of a firearm. See id. Of course, this panel has no authority to change our circuit's settled law on this subject. See United States v. Mitchell, 518 F.3d 740, 752 n.14 (10th Cir. 2008) ("This panel . . . may not overrule the decision of a previous panel."). But even if we were to consider the sufficiency of the evidence under this arguably heightened standard, we would affirm Bowen's firearm conviction.

As discussed above, the evidence presented at trial was more than sufficient to establish that Bowen knew Hall used a firearm during and in relation to the underlying crime in this case. Under the approach taken by the vast majority of our sister circuits, the only additional prerequisite to aider and abetter liability, in this context, is that a defendant intentionally facilitate or encourage another's use of a gun. Little is required to satisfy the element of facilitation. See United States v. Taylor, 226 F.3d 593, 597 (7th Cir. 2000) (explaining that it "does not take much to

---

[11](...continued)
the crime, that the principal will possess or use a firearm, and then [2] after acquiring knowledge intentionally facilitate the weapon's possession or use."); United States v. Bancalari, 110 F.3d 1425, 1430 (9th Cir. 1997) ("[T]he defendant must have directly facilitated or encouraged the use of the firearm and not simply be aware of its use."); Bazemore v. United States, 138 F.3d 947, 949 (11th Cir. 1998) (requiring [1] knowledge that a gun was used in the underlying crime, and [2] that there be "some proof linking the defendant to the gun").

satisfy" the element of facilitation once the Government has established an aider and abetter's knowledge of a firearm's use); Bazemore v. United States, 138 F.3d 947, 950 (11th Cir. 1998) (same); United States v. Bennett, 75 F.3d 40, 45 (1st Cir. 1996) (same). We have no difficulty concluding that Bowen's beating of Cline – during the same period in which Hall struck Cline with a firearm – facilitated Hall's use of the gun. Bowen's beatings of Cline both encouraged Hall's bludgeoning attacks and made it less likely that Cline would attempt to resist further assaults. Cf. Bazemore, 138 F.3d at 949 (holding that a defendant was sufficiently linked to the use of a firearm to be liable as an aider and abetter when he "knowingly accepted the gun's protection while" inspecting drugs). Consequently, even under this alternative standard, we would affirm Bowen's firearm conviction.

## IV.

Finally, Bowen requests that we remand so the district court may modify its written judgment to accurately reflect the sentence it announced at Bowen's sentencing hearing. At that hearing, the district court stated that Bowen would receive an 84 month consecutive sentence on his conviction under 18 U.S.C. § 924(c)(1)(A). In its written judgment, however, the district court recorded a 96 month consecutive term of imprisonment on this count. The Government acknowledges our precedent is unequivocal that "an orally pronounced sentence controls over a judgment and commitment order when the two conflict." United

25

States v. Avalos-Zarate, 986 F.2d 378, 379 (10th Cir. 1993); see also United States v. Marquez, 337 F.3d 1203, 1207 n.1 (10th Cir. 2003) ("[A]n oral pronouncement of sentence from the bench controls over other written language . . . ."). Accordingly, we grant Bowen's request for a remand, with instruction to the district court to bring its written judgment into conformity with its orally pronounced sentence.

For the reasons stated above, we **AFFIRM** Bowen's conviction under 18 U.S.C. § 924(c)(1)(A) and **REMAND** for the district court to bring its written judgment into conformity with its previously imposed, oral sentence.