Harry **WHEELER**, Appellant,

v.

**UNITED STATES**, Appellee.

Nos. 05–CF–716, 07–CO–637.

District of Columbia Court of Appeals.

Argued March 12, 2009.

Decided Aug. 13, 2009.

Judith A. Lovelace, appointed by the court, for appellant.

Sarah T. Chasson, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Denise Cheung, and Mary B. McCord, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ and BLACKBURNE–RIGSBY, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

Harry Wheeler appeals his conviction on one count each of conspiracy to commit

first-degree murder while armed, D.C.Code §§ 22–1805a, –2101, –4502 (2001); first-degree murder while armed, D.C.Code §§ 22–2101, –4502 (2001); and possession of a firearm during a crime of violence, D.C.Code § 22–4504(b) (2001). Wheeler argues that (1) there was insufficient evidence to support the convictions, (2) the trial court's jury instructions constitute reversible error, (3) the court impermissibly limited his constitutional right to confront witnesses and present a defense by restricting cross-examination and refusing to allow evidence that pointed to third-party motives for the murder, (4) the court erred in denying his motion for a mistrial, and (5) the court violated his constitutional right to confront witnesses and to present exculpatory evidence by refusing to continue the sentencing hearing and by denying his post-conviction motions. We affirm.

## I. Evidence at Trial

On April 1, 2003, an unidentified individual shot and killed Michael Taylor at the corner of 1st and R Streets, N.W., early in the evening. Police arrested appellant Wheeler two months later for murder, believing that Wheeler had "solicited and entered into an agreement with other individuals, and knowingly participated in the murder of Michael Taylor" in retaliation for Taylor's involvement in stealing money belonging to Wheeler. On February 4, 2004, a grand jury indicted Wheeler on the three charges on which he was eventually convicted.

During Wheeler's trial, witnesses discussed events after the theft leading up to Taylor's murder. According to Brittainy Johnson, the mother of Wheeler's child, Taylor had been involved in a robbery at her residence on March 31, 2003, the day before he was killed. Taylor and another individual had forcibly entered her house and stolen $17,000 that Wheeler had given her a week earlier for the care of their son. Johnson recognized Taylor, whom she had known since elementary school and regularly saw in the neighborhood.

Johnson testified that when she had told Wheeler that some men had stolen his money he was "very angry." Wheeler went to Brittainy Johnson's house and spoke with her father, police Sergeant Fred Johnson. Sergeant Johnson testified that Wheeler told him, "I'm going to do what I have to do and I'll go to jail behind this one." Brittainy Johnson told Wheeler the next day that Taylor had been one of the men who stole his money.

Chaz McCray, a friend of Wheeler's, testified that he had met with Wheeler and a number of other individuals outside of Johnson's house later on the day of the robbery. According to McCray, Wheeler was "very upset" and was "pouting, screaming his money got tooken." McCray said that Wheeler admitted he knew who had committed the robbery and screamed, "fuck, somebody [is] going to pay for this." McCray further testified that he had seen Wheeler again that night. He said that Wheeler spoke about knowing who had committed the robbery and getting "Slim" to "smash" the robber. According to McCray, "Slim" is a generic term to refer to an acquaintance, and "smash" means "get you killed, whooped, beat up, or some type of harm done to you." McCray added that Wheeler was going to get "Slim" to "smash" the robber because "Slim" would keep his mouth shut.

McCray also testified that he had seen Wheeler with another individual approximately eight times the next day, April 1. Wheeler was "still upset" about his stolen money each time McCray had seen him on the day of the murder. When McCray saw Wheeler at nightfall, however, after the murder, he was "more chilled, laid back, . . . [and] social with the crowd" and did not mention the robbery.

Anthony Babb, a close friend of Taylor's, testified that he had been with Taylor on the afternoon of the robbery and had seen Wheeler driving around Johnson's neighborhood. Wheeler called Babb and Taylor over to his truck and asked Babb if he had seen anything funny that day. According to Babb, Wheeler was "upset" and "serious" because somebody had robbed the mother of his son. Babb further testified that he had seen Wheeler again on the night of the robbery driving in Johnson's neighborhood with another individual. Wheeler called Babb over to Wheeler's truck and asked Babb again if he knew anything about the robbery. Wheeler told Babb that he had learned that one of the robbers drove a green Intrepid and said, "I know you know Mike [Taylor] got a green Intrepid." Babb thought Wheeler was "angry," but "a little sad." Despite assurances from Babb that Taylor had not been involved in the robbery, Wheeler told Babb that he was not going "to let that shit slide about his girlfriend['s] house getting robbed."

Babb also testified that in the early part of the afternoon the next day—the day of the murder—he had seen Wheeler again, driving in Johnson's neighborhood. Wheeler was accompanied by the same individual Babb had seen him with the previous day. (Brittainy Johnson's cousin, Theresa Johnson, similarly testified that she had seen Wheeler with another individual that same afternoon, and that Wheeler had told her Brittainy Johnson had mentioned to him that one of the robbers looked like Taylor). Babb approached Wheeler, who told Babb that people were telling him that Taylor had been one of the robbers. Wheeler said, "shit ain't looking good for your man." Babb added that he had seen Wheeler again two days after Taylor's funeral and asked him if he had had Taylor killed. Wheeler replied, "I don't know what happened to your man. Just like don't nobody know what happened to my house getting robbed."

Theodore Riley, an acquaintance of Wheeler's, testified that at some point Wheeler had approached him and was "real agitated and rushed." Wheeler told Riley, "When I find out who did it I'm going to yeah." Riley testified that he interpreted "yeah" as "smash," even though Wheeler never said "smash." Riley told Wheeler that if he needed any assistance, Wheeler should contact him. Riley acknowledged that he had made the offer so that "once [Wheeler] found out who did it if he needed any help killing the person, [Riley] was willing to assist." According to Riley, Wheeler responded, "all right," and drove off.

After Wheeler's arrest for Taylor's murder, he was incarcerated with Riley (who was serving time on an unrelated offense). Riley anticipated that Wheeler would be indicted for conspiracy to commit murder and testified that he had told Wheeler he could "beat the case" as long as the shooter did not cooperate with law enforcement. According to Riley, Wheeler replied, "I got my man. He's going to hold fast."

## II. Convictions and Sentencing

As a predicate for decision, it is important to understand precisely the indictment, the trial court's instructions, the jurors' verdicts, and the court's sentences. As to the indictment, the first count charged Wheeler with "Conspiracy to Commit Murder," citing the conspiracy and first-degree murder statutes[1] and the provision for enhancing a sentence for an offense "when armed."[2] The second count charged "First Degree Murder While

---

1. *See* D.C.Code §§ 22–1805a (conspiracy); – 2101 (first-degree murder).

2. *See* D.C.Code § 22–4502 (when armed with a dangerous or deadly weapon).

Armed (Premeditated)," [3] while the third count added "Possession of a Firearm During Crime of Violence or Dangerous Offense," [4] namely, the "First Degree Murder While Armed (Premeditated)" in the second count.

The trial court instructed the jury on five separate issues related to the three counts in the indictment. *First*, the court instructed on the second count, "first degree murder while armed" (and on the "lesser included offense of second degree murder while armed"). [5] *Second*, the court gave its "aiding and abetting" instruction, [6] applicable to the substantive offenses charged in the second and third counts: "murder and/or possession of a firearm during the crime of violence." *Third*, the court described the elements of the first count, "conspiracy to commit murder," [7] described as "a separate charge from murder itself." The court did not advert to the "armed" enhancement provision specified in the indictment and in the instruction for the second count. Nor did the conspiracy instruction otherwise refer to a firearm. *Fourth*, the court gave the *Pinkerton* [8] instruction as to the second and third counts that Wheeler could be "found guilty of the crimes of murder and/or possession of a firearm[,] which [were] allegedly committed by a coconspirator[,] even though [Wheeler] did not participate directly in the acts constituting ... those offenses," provided that they were "a reasonably foreseeable consequence of the conspiracy." [9] *Finally*, the trial court instructed on the "essential elements" of the third count, possession of a firearm during a crime of violence: [10] that "the Defendant possessed a firearm" (as defined); that he possessed it "while committing a crime of violence"; and that he possessed it "knowingly and intentionally," meaning "consciously, voluntarily and on purpose, not by mistake or accident." [11]

---

**3.** *See* D.C.Code §§ 22–2101 (first-degree murder); –4502 (when armed with a dangerous or deadly weapon).

**4.** *See* D.C.Code § 22–4504(b) (possession of a firearm during a crime of violence).

**5.** *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No.4.17 (4th ed. rev.2004) (first-degree premeditated murder and second-degree murder).

**6.** *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (4th ed. rev.2002) (aiding and abetting).

**7.** *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.93 (4th ed. rev.2004) (conspiracy).

**8.** *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *see* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02A (4th ed. rev.2002) (co-conspirator liability).

**9.** The government also had to prove that Wheeler was a member of the conspiracy "at the time" of the murder; that the murder occurred "during the existence of the conspir-

acy"; and that the murder was "in furtherance of the conspiracy." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02A (co-conspirator liability). The court left out the clause in element five of the standard *Pinkerton* instruction that "[i]t is not necessary to find that the crime was intended as part of the original plan," *id.*, an omission to which the government agreed.

**10.** *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.75 (4th ed.1993) (possession of a firearm during the commission of a crime of violence or dangerous crime).

**11.** The applicable statute creates a felony for possession of any "firearm," including a "pistol, machine gun, shotgun, [or] rifle ... while committing a crime of violence," including "murder." D.C.Code § 22–4504(b); *see* D.C.Code § 4–501(6) (2008 Supp.) (defining a crime of violence to include murder). Although the statute does not expressly include an "intent" element, the trial court instructed the jurors that, for conviction, they must find that the accused had possessed the firearm "knowingly and intentionally," meaning "consciously, voluntarily and on purpose, not by mistake or accident"—a requirement that

In announcing their verdicts, the jurors answered "guilty" to each of the charges posed by the trial court: "conspiracy to commit murder," "first degree murder while armed," and "possessing a firearm during the crime of violence." Later, at sentencing, the court imposed a sentence of sixteen months in prison for "conspiracy to commit murder," forty-five years for "first-degree murder while armed," and five years for "possessing a firearm," all sentences to run concurrently. Thereafter, the signed sentencing order referred to convictions for "Conspiracy," "Murder I w/Armed," and "Poss. of Firearm During Comm. of Crime of Violence." The conspiracy entry in the sentencing order did not reference the "armed" enhancement provision cited in the indictment.[12]

There was no dispute at trial that Taylor's death was caused by a firearm. Moreover, the court made clear from the outset that the murder charge concerned an armed offense; as noted above, the court initially instructed the jury on the second count, "first degree murder *while armed*" (emphasis added). The italicized phrase, however, did not appear again in the jury instructions, when the verdict was taken, or at sentencing—omissions, as we shall see, that complicate the analysis.

## III. Sufficiency of the Evidence and Instructional Arguments

Wheeler contends that the evidence at trial was insufficient to prove beyond a reasonable doubt that he had committed any of the three offenses charged. Two of these evidentiary contentions are premised on arguments that the trial court erred when instructing the jury on the second and third counts of the indictment: first-degree murder while armed and possession of a firearm during a crime of violence (PFCV). The instruction applicable to the first count, however—conspiracy to commit first-degree murder[13]—is not challenged. Accordingly, we shall first address sufficiency of the evidence under that conspiracy count, and then consider sufficiency under the second and third counts after resolving the instructional issues.

### A. Sufficiency of the Evidence: Count One (Conspiracy)

■■■■ "In reviewing a claim of insufficient evidence, this court must determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, reviewing the evidence in the light most favorable to the government, and giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable

the government does not contest. The phrase "knowingly and intentionally" is taken from the standard criminal jury instruction for possession of a firearm during the commission of a crime of violence, No. 4.75 (4th ed. rev. 2007), and is commonly used to signify a "general intent," rather than a "specific intent" crime (such as murder). *See, e.g., Hack v. United States*, 445 A.2d 634, 640 n. 6 (D.C. 1982). The criminal jury instructions for gun crimes take the words "knowingly and intentionally" from the instructions explaining the intent required for conviction of drug possession. *Compare, e.g.*, language and comment in CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.72 (4th ed. rev.2007) (posses-

sion of a prohibited weapon) *and* 4.73 (4th ed. rev.2007) (possession of an unregistered firearm) *with* that in No. 4.28 (4th ed. rev.2007) (possession of a controlled substance).

12. See note 2, *supra*.

13. Recall that the indictment charged Wheeler with "conspiracy to commit murder," citing not only the conspiracy and murder statutes but also the "when armed" enhancement provision. See notes 1 & 2, *supra*. The trial court, however, in its jury instruction and verdict form, limited the jury's consideration of the conspiracy in count one to a "conspiracy to murder," as specified in the heading of

inferences of fact." *McCoy v. United States,* 890 A.2d 204, 213 (D.C.2006) (internal citations and quotation marks omitted). We have said that to prove a conspiracy, the government must establish the following elements: "that an agreement existed between two or more people to commit a criminal offense; that the defendant knowingly and voluntarily participated in the agreement, intending to commit a criminal objective; and that, in furtherance of and during the conspiracy, a co-conspirator committed at least one overt act." *Id.* at 213–14 (citing *McCullough v. United States,* 827 A.2d 48, 58 (D.C.2003)).[14]

■ On this record, the government's evidence was sufficient for a rational trier of fact to have found Wheeler guilty of conspiracy to commit murder beyond a reasonable doubt. *First,* Wheeler had a clear motive to commit the murder: Two individuals had robbed the mother of his child of $17,000 that he had given her for the child's care. *Second,* Wheeler was extremely angry after the robbery, telling various individuals that he was going to get revenge. He said, for example, that "somebody was going to pay"; that he was "going to do what [he had] to do" and was willing to "go to jail behind this one"; that he was not going "to let that shit slide about his girlfriend['s] house getting robbed"; and that he was "going to yeah,"[15] meaning "smash," the perpetrator when he found out who was responsible for the robbery. *Third,* Wheeler then drove around the neighborhood with another individual,[16] seeking information about the identity of the man who had stolen his money. He eventually learned the identity of the robber from a number of individuals, including Brittainy Johnson-the victim of the robbery-who told Wheeler that Taylor had been one of the robbers.

*Fourth,* Wheeler then spoke about getting "Slim" (a slang term for an acquaintance, according to McCray) to "smash" (a slang term that, according to McCray, could mean kill, beat up, or cause some type of harm to) the robber. See note 15, *supra.* Wheeler even told one of Taylor's friends on the day of Taylor's murder that "shit ain't looking good for your man." *Fifth,* and also on the day of the murder, Wheeler was seen with the same man who had been with him on the day of the robbery.[17] *Sixth,* only thirty-one hours after Wheeler's $17,000 were stolen, Taylor was shot ten times with a nine millimeter Luger firearm by an unidentified black male.[18] *Seventh,* after the murder Wheel-

the indictment, without reference to a firearm.

**14.** As many courts have recognized, the government need not identify a defendant's co-conspirator as long as the government can show the existence of a conspiratorial agreement. *See, e.g., United States v. Sanchez–Garcia,* 461 F.3d 939, 946 (8th Cir.2006); *United States v. Contreras,* 249 F.3d 595, 598 (7th Cir.2001); *United States v. Mackay,* 33 F.3d 489, 493 (5th Cir.1994); *United States v. Rodriguez,* 765 F.2d 1546, 1552 (11th Cir. 1985).

**15.** Riley interpreted "yeah" as "smash," although Wheeler had not used that word. McCray testified that "smash" could mean "get you killed, whooped, beat up, or some type of harm done to you."

**16.** Babb described the man with Wheeler on the night of the robbery as in his early twenties, dark-skinned, about six-feet tall, with dreads, a beard, and a mustache.

**17.** Babb testified that the man riding with Wheeler early in the evening on the day of the murder was the "same person" who had been with him the day of the robbery. This time he was wearing blue jeans, a black sweatshirt with a hood, and black sneakers. Theresa Johnson, who also saw Wheeler on the day of the murder, described Wheeler's acquaintance as taller than Wheeler and wearing a black jacket with a hood.

**18.** Myesha Carter, who witnessed Taylor's shooting, described the shooter as a young, slim black man who was six-feet tall or more and wearing a black sweatshirt with a hood, a black coat, and blue jeans. Brandon Carter,

er no longer was angry; rather, "[h]e was more chilled, laid back, ... [and] social with the crowd."

Finally, Wheeler made two incriminating statements after the murder. When Babb asked Wheeler if he had had Taylor killed, Wheeler responded sarcastically, "I don't know what happened to your man. Just like don't nobody know what happened to my house getting robbed." While incarcerated with Riley, who advised that Wheeler could "beat the case" as long as the shooter did not cooperate with law enforcement, Wheeler replied, "I got my man. He's going to hold fast."

 Wheeler argues, nonetheless, that his uncorroborated out-of-court statements made after commission of the crime—that is, after he allegedly had entered into the agreement with his co-conspirator to kill Taylor with a firearm—cannot support his conviction. He contends that we should apply the holding in *Opper v. United States*, 348 U.S. 84, 90, 75 S.Ct. 158, 99 L.Ed. 101 (1954), recognized in *Smith v. United States*, 348 U.S. 147, 152, 75 S.Ct. 194, 99 L.Ed. 192 (1954), that statements made by an accused after the commission of a crime (but not those made before) regarding essential facts or elements of the crime require corroboration. Here, however, even accepting Wheeler's argument that the crime occurred at the moment he allegedly entered into the agreement to kill Taylor, and not later when the unidentified shooter actually shot Taylor, there is sufficient corroborative ev-

idence to support Wheeler's conviction. Wheeler's clear motive, extreme anger following the robbery, and actions to discover the identity of the robber, along with the close proximity in time between the robbery and the murder, as well as Wheeler's calm and relieved demeanor following the murder, provide sufficient corroboration for any statements that took place after he entered into the agreement with the unidentified shooter. Based on the evidence presented, therefore, even though largely circumstantial,[19] we are satisfied that a rational trier of fact could have found Wheeler guilty beyond a reasonable doubt of conspiracy to commit first-degree murder.

## B. Instructional Arguments: Count Two (First–Degree Murder While Armed) and Count Three (PFCV)

The trial court offered the jury two avenues to convicting Wheeler on the second count, first-degree murder while armed: as an aider and abettor and/or as a co-conspirator. His instructional arguments, therefore, unfold in the following order. First, the government concedes that the aiding-and-abetting instruction was deficient. Contrary to our en banc decision in *Wilson–Bey*,[20] this instruction did not require the jury to find that Wheeler, as an aider and abetter of the shooter, had intended to commit murder. More specifically, the instruction did not require the jury to find that Wheeler himself, after "premeditation and deliberation," had

who also witnessed the shooting, described the shooter as a young black man who was six-feet tall and wearing blue jeans, and a big black winter coat, white sneakers, and "had a hood on."

19. We have affirmed conspiracy convictions based on circumstantial evidence. *See, e.g., Baker v. United States*, 867 A.2d 988, 1007 (D.C.2005); *Green v. United States*, 651 A.2d 817, 818 n. 1 (D.C.1994). As recognized by

the U.S. Court of Appeals for the District of Columbia Circuit, the evidence supporting a conspiracy conviction nearly always is circumstantial because "[t]here is rarely in a conspiracy case direct evidence of the conspiracy or proof of declarations." *McNeil v. United States*, 66 App. D.C. 199, 204, 85 F.2d 698, 703 (1936).

20. *Wilson–Bey v. United States*, 903 A.2d 818, 836, 838 (D.C.2006) (en banc).

formed "the specific intent to kill" Taylor—the same murderous intent that the government would have had to prove for the shooter.[21] Instead, the trial court's instruction erroneously permitted the watered-down finding that Wheeler was guilty of murder because it was the "natural and probable consequence[ ]" of a crime, committed by another, in which Wheeler had "intentionally participate[d]."[22] Wheeler begins his argument, therefore, with the uncontested proposition that the jury's initial instruction on liability as an aider and abettor under the second count amounted essentially to a negligence instruction and thus expressed an invalid level of intent.[23]

Wheeler next turns to the *Pinkerton* instruction for co-conspirator liability, which authorized the jury to find Wheeler guilty of counts two and three, "murder and/or possession of a firearm," as a co-conspirator, if either crime was the "natural consequence" or the "reasonably foreseeable consequence" of the alleged conspiracy.[24] That instruction, he says—like the aiding-and-abetting instruction—failed to incorporate the higher level of intent required for first-degree murder.

From these observations, Wheeler argues that whether the jury used aiding-and-abetting or co-conspirator liability to find him guilty of count two—including the possibility that some jurors used one theory while the remaining jurors used the other—each instruction diluted the level of intent required to convict him of first-degree murder while armed. That is to say, each instruction allowed the jury to convict him of first-degree murder while armed if he acted negligently rather than with specific intent to kill with premeditation and deliberation. He adds, moreover, that even if this court were to "view[ ] the coconspirator liability instruction as properly given," the murder conviction could not stand because some of the jurors may have convicted him under the defective aiding-and-abetting instruction, precluding jury unanimity under a valid instruction.[25] Although creative, these instructional arguments must fail.

21. *Id.* at 843 (referencing CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.17 (first-degree premeditated murder and second-degree murder)).

22. According to *Wilson–Bey, supra* note 20, 903 A.2d at 836, "the 'natural and probable consequences' [language in the aiding-and-abetting instruction] cannot be permitted to dilute the principle that the *mens rea* required to prove premeditated murder, whether by a principal *or by an accomplice*, necessarily includes premeditation, deliberation, and a specific intent to kill" (emphasis added). Furthermore, "it is particularly inappropriate to permit the conviction of an aider or abettor upon a lesser showing of criminal intent than is required vis-a-vis a principal when the defendants are being prosecuted for homicide." *Id.* at 838.

23. Wheeler does not contest that an unidentified principal killed Taylor, committing first-degree murder while armed. Nor does

Wheeler question that the evidence supports a finding that-except for the required specific intent to kill with premeditation and deliberation-he satisfied the other elements of aiding and abetting. Thus, in the language of CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (aiding and abetting), see note 6, *supra*, the jury properly could have found that Wheeler "knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed."

24. See note 8, *supra*.

25. Wheeler does not address the relevance for count two of the unanimous conspiracy verdict on count one. Nor did he ask the trial judge for a special verdict form by which jurors could specify the theory on which they were deciding count two. Nor, finally, does he claim that the conspiracy and murder verdicts are inconsistent.

### 1. First–Degree Murder

As predicates for analysis, we note again that in convicting Wheeler, on count one, of conspiracy to murder, the jury found the specific intent to kill, with premeditation and deliberation, required by *Wilson–Bey* for conviction on count two of the murder itself. Furthermore—and this point is ultimately key to our analysis—the trial court's unchallenged conspiracy instruction on count one, although somewhat differently formulated, embraced all three critical elements of conspiracy specified in its *Pinkerton* co-conspirator liability instruction on count two, the validity of which we acknowledged in *Wilson–Bey*.[26] From these predicates, the analysis can proceed in two ways.

▐▌ First, even if one or more jurors, in deciding count two, focused on the erroneous aiding-and-abetting instruction, not on the valid *Pinkerton* co-conspirator liability instruction, they already would have found—by convicting on count one—that Wheeler had the specific, premeditated, and deliberate intent required by *Wilson–Bey* for the count two first-degree murder. Thus, the defect in the aiding-and-abetting instruction, permitting the jury to find Wheeler guilty of murder as the "natural

and probable consequence" of another individual's actions, was eclipsed—made harmless beyond a reasonable doubt—by the fact that the jury, in convicting of conspiracy to murder, unanimously found the higher, requisite intent for premeditated murder because a conspiracy to murder could hardly involve any lesser intent. Put another way, the jury's count one conspiracy conviction effectively provided the special verdict required to assure us that the jurors who found all the elements of aiding and abetting *also added in* a finding of the heightened mental state required by statute to prove first-degree murder. No member of the jury, therefore, could have relied exclusively on the lesser, negligence standard that Wheeler identifies as the presumed basis for conviction by one or more jurors under the aiding-and-abetting instruction.[27]

But there is a second, alternative approach. Because the count one conspiracy satisfied the defining elements of the count two *Pinkerton* co-conspirator liability instruction,[28] all jurors can be said to have found Wheeler guilty of a conspiracy that embraces all substantive crimes that were "a natural consequence" or "a reasonably foreseeable consequence" of the conspira-

---

**26.** 903 A.2d at 841–42. As summarized above in note 9, the *Pinkerton* co-conspirator liability instruction for count two required the government to prove that (1) Wheeler was a member of the conspiracy "at the time" of the murder; that (2) the murder occurred "during the existence of the conspiracy"; and that (3) the murder was "in furtherance of the conspiracy." The conspiracy instruction for count one, correspondingly, required proof that (1) "between March 31, 2003, and April 1, 2003, an agreement existed between two or more people to commit the crime of murder," and that "the Defendant intentionally joined in that agreement ... [and] was part of the conspiracy"; that (2) the murder occurred "during the charged time period"; and that (3) "one of the people involved in the conspiracy did something for the purpose of carrying out the conspiracy[,] ... an overt act.... And

the overt act alleged in this case is the alleged killing of Michael Taylor."

**27.** Although we have found the instructional error harmless, we ordinarily would review, more accurately, for plain error—an even more difficult standard for Wheeler to meet—because Wheeler did not challenge the aiding-and-abetting instruction at trial. We need not belabor that analysis, however, in light of our harmless error conclusion, although for completeness we can assuredly say that, however plain the error may have been, it did not "seriously affect[ ] the fairness, integrity or public reputation" of the judicial proceeding. *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal citation omitted).

**28.** See note 26, *supra.*

cy. In *Wilson–Bey,* we called criminal conspiracy "an offense of the gravest character"; as a "partnership in crime," it justifies conviction of each conspirator for all reasonably foreseeable criminal acts of a co-conspirator (deemed at law to be the conspirator's agent) "without proof of the *mens rea* otherwise required for the subsequent crime."[29] Under *Pinkerton,* therefore, the intent necessary for conviction of murder as an aider and abettor under *Wilson–Bey* yields to virtually the same state of mind—the lesser foreseeability or natural and probable consequences standard—found erroneous in the court's aiding-and-abetting instruction. In short, a conspiracy—an agreement not necessarily present among aiders and abettors—is deemed a substitute for the particular state of mind required for convicting a nonconspiratorial accomplice of murder under *Wilson–Bey.* A jury finding that Wheeler had the state of mind required for conviction of first-degree murder was therefore not necessary for conviction under the *Pinkerton* theory.

Ultimately, however, there is one overriding reality that makes the *Wilson–Bey*

error harmless. Every juror found, at the very least, that Wheeler had joined a criminal conspiracy with an unknown co-conspirator, and every juror found that Taylor's murder was the natural or probable result of that conspiracy. Those findings suffice for *Pinkerton* co-conspirator liability, and Wheeler's conviction of first-degree murder accordingly must be upheld.[30]

## 2. First–Degree Murder "While Armed" and PFCV

Reliance on the count one conspiracy instruction to cure the defect in the aiding-and-abetting instruction, however, extends only to the intent to murder; the conspiracy instruction says nothing about the additional "while armed" language in count one of the indictment or about the validity of the count two instructions as applied to PFCV.[31] Thus, we must consider whether the aiding-and-abetting instruction and/or the *Pinkerton* co-conspirator instruction adequately covered the additional jury finding required for conviction of murder "while armed," as well as the findings necessary for conviction of PFCV.[32]

---

**29.** 903 A.2d at 841–42 (internal citations omitted).

**30.** Sufficiency of the evidence, other than the required level of intent, is not contested. See note 23, *supra.*

**31.** Moving from its instruction on aiding and abetting to its instruction on conspiracy, the court said: "[T]he Defendant is charged with conspiring to commit murder. It is against the law to agree with someone to commit the crime of murder. *And I've already instructed you on the offense of murder"* (emphasis added). Actually, moments earlier, the court had given a murder-*while-armed* instruction, making clear that the government must prove that Wheeler was guilty of murder "while armed with a firearm," which the court defined as "a weapon which will … expel a bullet or other projectile by means of a[n] explosive." Nonetheless, the court limited the conspiracy instruction to "murder," and it is too much of a stretch to say that the court incorporated a firearm into the conspiracy instruction merely

by telling the jurors that "I've already instructed you on the offense of murder." Nor did the conspiracy instruction advert to any element of the third count: possession of a firearm during a crime of violence.

**32.** In raising sufficiency of the evidence under count two, Wheeler embraces, but does not expressly address, the "while armed" issue. He does, however, ask us to apply *Wilson–Bey* logic to the firearm charge under count three. He stresses that the PFCV statute, as interpreted in the standard criminal jury instructions, requires the jury to find that the accused had possessed the firearm "knowingly and intentionally," meaning "consciously, voluntarily and on purpose, not by mistake or accident," see notes 10 & 11, *supra,* whereas the court's aiding-and-abetting instruction authorized conviction merely "if it was reasonably foreseeable to the aider and abettor that some type of weapon was required to commit the offense"—a negligence standard, according to Wheeler. As to the third count, there-

■ Had the jury not convicted Wheeler of conspiracy to murder, two decisions of this court, *Wilson–Bey* and *Lancaster*,[33] would have dictated that his conviction of aiding and abetting PFCV required, respectively, a proper instruction, followed by a jury finding, that Wheeler "took specific steps" to assist Taylor's killer in the actual possession of a firearm; a "general participation in the criminal venture to prove aiding and abetting of the possessory firearms offense" is not enough.[34] Thus, without a conspiracy, a jury finding on count two that "it was reasonably foreseeable to the aider and abettor that some type of weapon was required" to commit Taylor's murder would not suffice for conviction of PFCV.[35] Similarly, if *Wilson–Bey*

fore, relying on *Wilson–Bey*, Wheeler asks us to reject the aiding-and-abetting instruction for PFCV.

**33.** *Lancaster v. United States*, 975 A.2d 168 (D.C.2009).

**34.** *Id.* at 175 (internal citation and quotation marks omitted). Although PFCV apparently may be characterized as a "general intent" crime, see note 11, *supra*, our recent decision in *Lancaster* required the same criminal intent for an aider and abettor of PFCV as for the principal. *Lancaster*, therefore, necessarily implies a requirement that the trial court apply *Wilson–Bey* to PFCV and instruct accordingly. As a result, *Lancaster* makes clear that *Wilson–Bey* is not limited to specific intent crimes—a conclusion that this court reached implicitly last year in *Coleman v. United States*, 948 A.2d 534 (D.C.2008). In *Coleman*, we relied on *Wilson–Bey* to vacate a conviction for aiding and abetting second-degree murder—a crime requiring proof of no more than a " 'conscious disregard of an extreme risk of death or serious bodily injury,' " *id.* at 552–553 (internal citation omitted)— when the court's instruction allowed the jury to find guilt under the "natural and probable consequences rule," tantamount to criminal liability for the accomplice's negligence. In this connection, it is worth noting that in response to *Wilson–Bey*, the 2008 version of the standard aiding-and-abetting jury instruction states, without distinction as to the state of mind required for the offense involved, that "the government must prove beyond a reasonable doubt that the defendant personally acted with [*insert mens rea required for the charged offense*]." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (4th ed. rev.2008).

In *Lampkins v. United States*, 973 A.2d 171, 174 (D.C.2009), a division of this court concluded that the trial court's aiding-and-abetting instruction did not violate *Wilson–Bey* because "distribution of narcotics is a general intent crime." That decision is not binding here because this court's earlier decision in *Coleman*, finding *Wilson–Bey* applicable to second-degree murder, implicitly rejected that reasoning, and we have ruled on several occasions that, when decisions of this court are in conflict, the earlier decision applies. *See, e.g., Thomas v. United States*, 731 A.2d 415, 420 n. 6 (1999) ("Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one.") (internal citations omitted.)

**35.** Case law addressing aiding and abetting under the federal statute for possession of a firearm during a crime of violence, 18 U.S.C. § 924(c) (2006), supports this conclusion. Many courts have held that this federal analogue to the District's PFCV statute requires something more than the ready availability of a firearm during the commission of a crime of violence for a conviction of aiding and abetting PFCV. Rather, the government must prove "that appellant knew a firearm would be carried or used in a crime of violence and that he willingly took some action to facilitate that carriage or use." *United States v. Otero-Mendez*, 273 F.3d 46, 52 (1st Cir.2001). Other federal circuits have issued similar rulings. *See, e.g., United States v. Thompson*, 454 F.3d 459, 466 (5th Cir.2006); *United States v. Robinson*, 389 F.3d 582, 591 (6th Cir.2004); *United States v. Daniels*, 370 F.3d 689, 691 (7th Cir.2004); *Bazemore v. United States*, 138 F.3d 947, 949 (11th Cir.1998); *United States v. Bancalari*, 110 F.3d 1425, 1429–30 (9th Cir.1997); *United States v. Medina*, 32 F.3d 40, 45 (2d Cir.1994). *But see United States v. Bowen*, 527 F.3d 1065, 1079 (10th Cir.2008) (requiring "only that an aider and abetter (1) know a cohort used a firearm in an underlying crime of violence, and (2) knowingly and actively participate in that underlying crime" but noting that other circuits also require "that a defendant's participation in the under-

were applicable to the "when armed" language in D.C.Code § 22–4502(a)—an issue we do not decide—we could not conclude that the trial court's instruction, allowing the jury to rely on "reasonable foreseeability" of a firearm, satisfied the intent requirement for aiding and abetting an armed offense under § 22–4502(a).[36]

## C. Sufficiency of the Evidence: Count Two (First–Degree Murder While Armed) and Count Three (PFCV)

We need not consider such *Wilson–Bey* applications further. Given our conclusion that the count one conspiracy conviction embraced the elements of a *Pinkerton* conspiracy, we must conclude that a unanimous jury properly found Wheeler guilty of murder "while armed," as well as PFCV. Based on the evidence presented in Part I and assembled in Part III. A. to demonstrate Wheeler's participation in a conspiracy to murder Taylor, we are satisfied that Taylor's murder by an "armed" killer, and thus the killer's "possession of a firearm during a crime of violence," were—like the murder itself—crimes readily described as "natural" or "reasonably foreeseeable" consequences of that conspiracy. Those overt acts by Wheeler's

unknown co-conspirator justified, under *Pinkerton,* the jury's verdicts convicting Wheeler not only of conspiracy to murder but also of first-degree murder while armed and possession of a firearm during a crime of violence. As we have observed in analyzing the murder in Part III. B. above, the fact that some jurors may have relied on the erroneous aiding-and-abetting instruction, rather than on the *Pinkerton* theory, to find reasonable foreseeability is irrelevant, and the instructional error harmless, given the legal validity of the result under *Pinkerton.*

## IV. Cross–Examination (*Jencks* Issue)

Wheeler argues that the trial court improperly limited his attempts to test Babb's memory, credibility, and bias. Defense counsel requested *Jencks*[37] material for use in cross-examining Babb about his assistance to law enforcement officers under a plea agreement admitting his participation in a conspiracy to distribute cocaine, for which he had not yet been sentenced. Pursuant to that agreement, Babb agreed to "provide the police with information about ongoing crime" in the hope that the government would recommend a lenient sentence. Counsel for Wheeler therefore asked for *Jencks* statements[38] by Babb pertaining to cases oth-

---

lying crime directly facilitate the use of a firearm.").

**36.** As an enhancement provision, § 22–4502(a) "does not define a separate criminal offense" and "requires mere availability of a weapon"—meaning a firearm—to the principal offender. *Broadie v. United States,* 925 A.2d 605, 617 (D.C.2007) (quoting *Washington v. United States,* 366 A.2d 457, 461 (D.C. 1976)). We have equated such availability, at a minimum, with "constructive possession." *Guishard v. United States,* 669 A.2d 1306, 1314 (D.C.1995). Because possession (actual or constructive) requires knowledge of the weapon and intent to exercise dominion and control over it, *see Blackmon v. United States,* 835 A.2d 1070, 1075 (D.C.2003), it would not be fanciful to suggest that such knowledge and intent must be shown on the part of an aider and abettor, as well as the principal

offender, to prove "while armed" enhancement. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (4th ed. rev. 2008) (aiding and abetting).

**37.** *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); *see* Jencks Act, 18 U.S.C. § 3500 (2006); Super Ct.Crim. R. 26.2 (implementing Jencks Act).

**38.** *See* Super. Ct.Crim. R. 26.2(f), defining "statement" as:

(1) A written statement made by the witness that is signed or otherwise adopted or approved by the witness;
(2) A substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, elec-

er than Wheeler's; he reasoned that if the information Babb provided before Wheeler's trial had not been useful to the police, then his testimony at Wheeler's trial, favorable to the government, would have been especially important in achieving a lighter sentence for his part in the cocaine conspiracy. In short, counsel wanted the *Jencks* statements for help in exploring whether Babb had an incentive to exaggerate the information he provided against Wheeler.

■ Before the government must produce *Jencks* material to the defense, four prerequisites must be satisfied: "The material must be in the possession of the government; the defense must request the material; the material must constitute a 'statement' as defined [in the Jencks Act]; and the statement must relate to the subject matter of the witness' direct testimony." *Lyles v. United States*, 879 A.2d 979, 983 n. 12 (D.C.2005) (quoting *Butler v. United States*, 481 A.2d 431, 446 (D.C. 1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985)).

In assessing Wheeler's argument, it is important to repeat that trial counsel was seeking information from the government about Babb's statements concerning crimes other than those charged against Wheeler. It is highly questionable, therefore, whether any statement pertaining to those other crimes can be said to "relate to the subject matter of the witness' direct testimony," *id.*, in Wheeler's trial, because Babb's testimony, aside from preliminaries, focused entirely on his interactions with Wheeler during the thirty-one hours immediately preceding Taylor's murder. Defense counsel told the trial court, however, that this "subject matter" criterion

was satisfied because the government had introduced Babb's plea agreement in evidence and Babb, on direct examination, had provided details of his cooperation with the police in other cases. The trial court deflected that argument by calling the requested material irrelevant.

■ We need not resolve this "subject matter" issue, or even resolve whether Babb had made "statements" [39] that would qualify for disclosure as *Jencks* material if they pertained to the subject matter of Babb's direct examination. The trial court was correct: the requested material could not have been relevant to trial counsel's only stated reason for seeking the material, because whether the information Babb had supplied to the police about other crimes had, or had not, been useful to law enforcement was entirely beyond the ability of Babb, or Wheeler's trial counsel, to evaluate. Only the police and the prosecutors could evaluate the usefulness of information provided by Babb in other matters.

The trial court ruled that defense counsel was "free to examine [Babb] about any bias or motivation he ha[d]," and counsel did so effectively. As to credibility, counsel established that Babb had been a drug dealer, was facing a substantial federal sentence for conspiracy to sell drugs, and had agreed to cooperate with the government in the hope of receiving a lenient sentence. As to bias, counsel elicited that Babb had worn a wire to record conversations with various drug dealers, but not with his friend, Taylor, who also was a drug dealer. Nor did he report Taylor's theft at Brittainy Johnson's house to the police. Moreover, once Babb learned that Wheeler believed Taylor had been the robber, Babb and Taylor discussed getting

trical, or other recording or a transcription thereof; or

(3) A statement, however taken or recorded, or a transcription thereof, made by the witness to a grand jury.

**39.** See note 38, *supra*.

guns to deal with the tense situation that was developing. Counsel, it is clear, elicited considerable evidence bearing on Babb's memory, credibility, and bias. In contrast with this evidence, the information that counsel might have obtained from his request for *Jencks* material related to other cases was so speculative that no potential benefit to the defense is discernible.

 Furthermore, we agree with the government: "satisfying appellant's cross-examination request would have required a wholesale fishing expedition through potentially countless confidential investigative files." This would have offered minimal probative value to the defense when compared with the substantial prejudice to the government. As we have said, the Jencks Act is not a tool for discovery; rather, "[o]ne purpose of the *Jencks* Act was to restrict defendant's right to any general exploration of the government's files." *Hilliard v. United States,* 638 A.2d 698, 704 (D.C.1994) (internal citations and quotation marks omitted). All things considered, therefore, we conclude that the trial court did not abuse its discretion [40] in denying trial counsel's request for *Jencks* material.[41]

## V. Evidence of Third–Party Motives

Wheeler also asserts that the trial court erred in granting the government's motions to preclude evidence of cocaine found in Taylor's possession and the presence of drugs in his system. Defense counsel objected, arguing "it's just as likely that [Taylor] was killed in the process of doing a drug transaction," and thus that a third party, not Wheeler, was responsible.

 Evidence that a third party committed the crime for which the defendant is charged may be presented through the testimony of defense witnesses when there are sufficient indicia that the evidence is reliable. However, "to be admissible, evidence proffered by the defense must 'tend to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense.'" *Gethers v. United States,* 684 A.2d 1266, 1271 (D.C.1996) (quoting *Johnson v. United States,* 552 A.2d 513, 516 (D.C.1989)); *see also Winfield v. United States,* 676 A.2d 1, 5 (D.C.1996) (en banc) (holding that mere proof of third-party motive to commit crime does not ordinarily create "real possibility" that third party was perpetrator, and that trial judge has "discretion to exclude marginally relevant evidence" that may distract jury from culpability of defendant). In *Gethers,* moreover, we emphasized that "[none] of our prior decisions suggested that the third party could be a hypothetical person, *i.e.,* an unidentified, unknown person with only generic reasons for committing the crime."

---

**40.** Trial courts have "considerable discretion" in ruling on disclosure of *Jencks* material. *Johnson v. United States,* 800 A.2d 696, 699 (D.C.2002) ("[A]dministration of the Jencks Act must be entrusted to the good sense and experience of the trial judges subject to appropriately limited review of appellate courts.") (quoting *United States v. Augenblick,* 393 U.S. 348, 355, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969)). Therefore, we review the trial court's determination for an abuse of discretion.

**41.** Wheeler also argues that he was not allowed sufficient opportunity to cross-examine

McCray. The trial court in no way abused its discretion when it sustained as irrelevant the government's objections to defense counsel's questions regarding who gave McCray cocaine to sell that day. *See Rose v. United States,* 879 A.2d 986, 991 (D.C.2005) (holding that trial court's ruling as to relevance is discretionary decision that will be upset on appeal "only upon a showing of grave abuse.") (internal citations omitted). McCray answered that he did not remember, and, in any event, the name of McCray's supplier was irrelevant to Wheeler's liability for murder.

684 A.2d at 1271. Here, Wheeler argues that evidence of cocaine found on Taylor and the presence of drugs in his system would have shown that Taylor had a "dangerous lifestyle" and was at a "high risk of violent death" from "[r]ival drug dealers, dissatisfied customers, or frustrated robbers." This argument fails to provide anything more than "a hypothetical, unidentified person who may have had a motive" to commit the murder. *Id.*[42]

## VI. Motion for Mistrial

Wheeler maintains that the trial court abused its discretion when it failed to grant his request for a mistrial after Babb spontaneously testified that Wheeler "had got Mike [Taylor] killed." The trial court struck Babb's comment and directed the jury to "disregard [Babb's] belief about who did the shooting" because he had "no personal knowledge."[43] The court then denied defense counsel's motion for a mistrial.

 As Wheeler recognizes, "[a] decision whether to declare a mistrial is committed to the sound discretion of the trial court." *Smith v. United States,* 665 A.2d 962, 966 (D.C.1995). In reviewing that discretion and thus assessing the degree of prejudice suffered by Wheeler from the trial court's ruling, we must consider "the gravity of the misconduct, the relative strength of the government's case, the centrality of the issue affected, and any mitigating actions taken by the court, all the while giving due deference to the decision of the trial judge, who had the advantage of being present not only when the alleged misconduct occurred, but throughout the trial." *Coleman v. United States,* 779 A.2d 297, 302 (D.C.2001) (quoting *Bennett v. United States,* 597 A.2d 24, 27 (D.C.1991)). After applying these criteria and noting in particular the trial court's curative instruction, we conclude that the trial court did not abuse its discretion; denial of Wheeler's motion for a mistrial was in no way "irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Roy v. United States,* 871 A.2d 498, 505 n. 3 (D.C. 2005) (quoting *Parker v. United States,* 757 A.2d 1280, 1286 (D.C.2000)).

## VII. Post–Trial Motions

Wheeler argues that the trial court erred in denying his post-trial motions asking for a continuance of his sentencing hearing and alleging ineffective assistance of trial counsel. Neither argument has merit.

### A. Request for Continuance at Sentencing

 Citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Wheeler argues that the government had unlawfully withheld exculpatory information, specifically, the fact that the Internal Affairs Division (IAD) of the Metropolitan Police Department (MPD) had

---

**42.** Wheeler's additional argument that the trial court erred in sustaining the government's objections to defense counsel's attempts to elicit information about whether an associate of Taylor's named Petey resembled the shooter is similarly without merit. Contrary to Wheeler's assertion, it is unclear from the record that the defense was attempting to identify Petey as the shooter, and in any event there was no "reasonable possibility" that Petey committed the offenses with which Wheeler was charged. *Id.*

**43.** The following colloquy took place between the trial judge and Babb following Babb's statement that Wheeler "had got Mike [Taylor] killed."

> **Court:** ... I understand you did not see the shooting, sir, is that correct?
> **Babb:** Yes, ma'am.
> **Court:** You have no personal knowledge so the jury is to disregard [Babb's] belief about who did the shooting. But the witness may explain why he did what he did.

been investigating Sergeant Fred Johnson, Brittainy Johnson's father, because of his failure to call the police or file a report about the robbery until after Taylor's murder. Wheeler then contends that the trial court abused its discretion when, at the sentencing, it denied his request for a continuance, as well as his motion to compel discovery, to obtain more information about that investigation.[44] It appears that counsel filed these motions in anticipation of timely seeking a new trial or filing a collateral attack.

Wheeler stresses that evidence of Sergeant Johnson's investigation and eventual suspension by the IAD would have provided "strong impeachment of a critical government witness" in light of Johnson's testimony at trial that his failure to report the robbery caused him no problems at the police department. The record confirms, to the contrary, that Sergeant Johnson's testimony was not false. An affidavit provided by Sergeant Anthony Langley of the IAD states that although the lead homicide investigator in Wheeler's case had contacted a supervisor at IAD in 2003 to express his concerns about Sergeant Johnson's conduct in the matter, IAD did not pursue an investigation in 2003 because there had been "no specific information or evidence that implicated Sergeant Johnson" at that time. The "first and only formal M.P.D. investigation" of his conduct in connection with the homicide occurred shortly after Wheeler's trial ended in February 2005. Sergeant Langley conducted that investigation in the spring and summer of 2005 (when he learned about the 2003 information outlined above) and filed his final report in July 2005. After "further disciplinary proceedings in this matter in 2005 and 2006, Sgt. Johnson's service with the M.P.D. was terminated in May, 2006."

Wheeler challenges the particulars of Langley's affidavit. According to counsel on appeal, Wheeler was indicted in February 2004 and thus "the homicide investigation was over." Counsel then argues that either the police had been investigating Sergeant Johnson earlier than the Langley affidavit indicated, and thus that Johnson had "lied at trial," or the investigation commenced in 2005, as Sergeant Langley wrote, and "the police deliberately undermined Mr. Wheeler's right to a fair trial by holding off on formal investigation until after Sgt. Johnson had testified and there was a guilty verdict." With all respect due, counsel's alternatives amount to considerable speculation. There is no reason to believe that Sergeant Langley was lying under oath. Furthermore, even if we assume the truth of counsel's second alternative, that the government deliberately delayed the investigation of Sergeant Johnson until after Wheeler's trial was over, there is no basis, other than counsel's guess, for believing that Johnson was aware of that ploy.

In any event, Wheeler is incorrect in suggesting that defense counsel had been unable to impeach Sergeant Johnson's testimony at trial. No one disputes that Sergeant Johnson should have reported the robbery, and that his failure to do so came to light during the trial. In fact, Sergeant Johnson admitted before the jury that IAD was "monitoring" him as a result of his failure to report the robbery. The jury, therefore, had information casting a shadow over Sergeant Johnson's credibility and possible bias in favor of the govern-

---

**44.** Wheeler's motion to compel discovery asked the trial court to order the government to provide the following documents: (1) the lead homicide investigator's request to IAD in 2003 to look into Sergeant Johnson's failure to report the robbery; (2) documents related to IAD's decision to await further information before pursuing an investigation of Sergeant Johnson; (3) an IAD report of July 18, 2005, sustaining the allegations against Sergeant Johnson; and (4) any other related materials.

ment. Accordingly, even if the government had delayed the investigation for the alleged tactical purpose and Sergeant Johnson had been aware of that fact, Johnson's testimony would not have greatly assisted the defense. His acknowledged awareness—perhaps from the aborted 2003 activity—that he was being "monitored" for his behavior at the time of the killing supplied much of the impact that Wheeler hoped to develop through discovery. All things considered, therefore, we can perceive no abuse of trial court discretion in refusing to continue Wheeler's sentencing and in denying his motion to compel discovery.

## B. Ineffective Assistance of Counsel

Wheeler filed several *pro se* motions under D.C.Code § 23–110 (2001) alleging trial counsel's ineffectiveness. Then, through counsel, he filed a supplemental motion alleging that trial counsel had failed to call favorable witnesses. The trial court denied Wheeler's motions without a hearing "[f]or the reasons set forth in the government's opposition" and denied a related motion to compel discovery as moot.

On appeal, Wheeler contends that his trial counsel inadequately investigated his case and, more specifically, failed to present testimony from Jermaine Dunmore and George Johnson, who he claims would have provided exculpatory testimony. Wheeler alleges that these two individuals had been with McCray when he spoke with Wheeler on the day of the robbery. He further alleges that they

would have testified that the alleged conversation between McCray and Wheeler, in which Wheeler had said he was going to get "Slim" to "smash" the robber, never occurred. Wheeler, however, submitted no affidavits from Dunmore or Johnson that they would testify to this effect. In contrast, the government provided an affidavit from Wheeler's trial counsel explaining that he had been aware of these potential witnesses, who were in custody pending narcotics charges in federal District Court; that he had obtained a writ for their presence at trial; that George Johnson's counsel, however, would not let Johnson speak with Wheeler's trial attorney; and that both Dunmore and Johnson had "5th Amendment issues related to their pending federal narcotics case." Wheeler's trial counsel further explained that, in the end, he had made a tactical decision not to call Dunmore or Johnson because they were asserting their Fifth Amendment privileges not to testify and because he had learned from their attorneys that their potential testimony would not have been helpful to Wheeler.[45]

Absent any information from Wheeler as to what these witnesses would have said at trial, and given trial counsel's detailed explanation as to why he had not called them to testify, we perceive no constitutional deficiency in trial counsel's performance. *See Strickland, supra* note 45, 466 U.S. at 687–98, 104 S.Ct. 2052. Because the record "conclusively show[s]" that Wheeler "is entitled to no relief," D.C.Code § 23–110(c), the trial court did not abuse its

---

**45.** We note that trial counsel did not err in failing to seek immunity for Dunmore or Johnson. *See Carter v. United States*, 684 A.2d 331, 344 (D.C.1996) (en banc) (immunity of crucial defense witness who asserts privilege against self-incrimination depends on whether proposed testimony is "(a) material, (b) clearly exculpatory, (c) non-cumulative, and (d) unobtainable from any other source."). Counsel's affidavit demonstrates his reason-

able belief, based on discussions with Johnson's and Dunmore's attorneys, that "the potential testimony of Mr. Johnson and Mr. Dunmore would not have been helpful to Mr. Wheeler." *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[T]he proper standard for attorney performance is that of reasonably effective assistance.").

discretion in denying Wheeler's motions without a hearing. *See Sykes v. United States*, 585 A.2d 1335, 1340 (D.C.1991) (internal citations omitted).

*Affirmed.*[46]

**46.** The court wishes to express its appreciation and respect for the outstanding work performed by appointed counsel in briefing and arguing this case.